**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------x

**Index No #**
**Date:** December 16th, 2024

**COMPLAINT**

**SEHRA WAHEED**
*Plaintiff*

                        - *Against* -


**MOLLY WASOW PARK AS COMMISSIONER**
**OF THE CITY OF NEW YORK DEPARTMENT**
**OF SOCIAL SERVICES, SCOTT FRENCH AS**
**THE ADMINISTRATOR OF NEW YORK CITY,**
**DEPARTMENT OF SOCIAL SERVICES**
**HUMAN RESOURCES ADMINISTRATION,**
**HRA, THE CITY OF NEW YORK**
*Defendant*
-----------------------------------------------------------------x
**STATE OF NEW YORK:**
**COUNTY OF NEW YORK }**


I, ***Sehra Waheed "Plaintiff appearing as Pro-Se"*** in this case being duly sworn, deposes & says:


# INTRODUCTION

---

1. This is a complaint against HRA for not complying with their legal obligation to meet all processing timelines as stated on their site and as required by law regarding SNAP and cash assistance applications and recertifications and to maintain reliable, functional application and recertification application processes, such as eligibility interviews and verification procedures. In 2022 and 2023, I applied for home and storage rental payments with the New York City Human Resources Administration (HRA). Having received no response to my request, I submitted scheduling of Fair Hearing for agency's failure to pay home rent that resulted in eviction and auction of all my property

in storage. It was ordered by two fair hearing judges that I was eligible for special grant to be paid for agency's failure to comply with my request for payment. However, by the end of 2024, HRA continues to fail to comply with HRA Judge's orders and deprive me of my right to payments by issuance of special grants. As a result, and as advised by the advocate's office, I am left with no option but to commence this lawsuit to claim damages incurred due to HRA's negeglience and loss of my home and  property.

2.  Respondents failed to make a timely decision regarding my initial request for payments for home and storage rent and failed to comply with fair Hearing Judges to issue special grants. Respondents violated my constitutional right to due process and to give me notice of the availability of "temporary assistance" benefits at the time of application. With respect to the claim, I am seeking damages for on-going harm and in their repeated failure to help pay rent that I requested on multiple occasions. I demanded that HRA "immediately" award me temporary rental assistance while HRA conducted its investigation as to my qualification. This demand was never made or granted pending completion of an application. Pursuant to Social Services Law § 133 and N.Y. Constitution, article XVII, § 1, and that the HRA failed to render a decision on requests for temporary assistance in a timely manner. "Upon application for public assistance or care under this chapter, the local social services district shall notify the applicant in writing of the availability of a monetary grant adequate to meet emergency needs assistance or care and shall, at such time, determine whether such person is in immediate need. If it shall appear that a person is in immediate need, emergency needs assistance or care shall be granted pending completion of an investigation. The written notification required by this section shall inform such person of a right to an expedited hearing when emergency needs assistance or care is denied. A public assistance applicant who has been denied emergency needs assistance or care must be given reason for such denial in a written determination which sets forth the basis for such denial"

3.  The current section 133 states that notice shall be provided concerning "the availability of a monetary grant adequate to meet *emergency needs* assistance or care". On the other hand, future claimants may rely on the newly-added words "under this chapter" as support for their argument that section 133 applies to all benefits available under the Social Services Law—to Medicaid payments as well as to payments for food and shelter. After the New York City Human Resources Administration (HRA) reduced my shelter allowance, I requested a "fair hearing" before the New York State Office of Temporary and Disability Assistance (OTDA). At the hearing, HRA, a city agency, agreed to award me monetary special grant. OTDA, a state agency, issued a "Decision After Fair Hearing" consistent with HRA's representation. HRA did not act immediately, I am now seeking enforcement of its decision for HRA did not complying with Fair Hearing Orders. I commenced this action to seek and to compel HRA to comply with Fair Hearing Judge's decision. HRA to date have not paid special grant and fully complied with Fair Hearing Judge's ruling. I will be successful in this lawsuit as a "prevailing party" and therefore entitled to attorney's fees when and if I retain counsel after initiation of this lawsuit for the relief I sought, namely HRA's compliance and order compensation.

## PRELIMINARY STATEMENT

1. I am now a low-income New Yorker living below or near the poverty line and rely on Supplemental Nutrition Assistance Program ("SNAP") and Cash Assistance benefits administered by the New York City Department of Social Services/Human Resources Administration ("HRA") to feed themselves and their families.

2. Defendants, the City of New York, the Commissioner of the New York City Department of Social Services, and the Administrator of the New York City Human Resources Administration, are responsible for ensuring these essential programs comply with the law.

3. I bring this action to challenge Defendants' failure:

   a) To process applications and recertifications for these subsistence-level benefits within the timeframes required by federal and state law; and

   b) To maintain functional systems that enable SNAP and Cash Assistance households to submit applications and recertifications for these benefits.

   c) Defendants' failures forces families to go hungry or make impossible decisions like whether to pay rent or feed their children.

   d) Defendant's failure to comply with Fair Hearing Judge's Order to pay Apartment rent went unpaid and I was evicted. A judgement of $90,000 is granted to Landlord against me due to defendant's failure to pay.

   E) Defendant's failure to comply with Fair Hearing Judge's Order to pay Storage rent after eviction that was also unpaid as a result my whole apartment lifetime invested personal and business belongings worth $1.5,000,000 was auctioned for unpaid bill. All my Personal belongings valued at $439,854.97 and Business intellectual property copyright and patent protected design secrets for (Gucci Fendi Presentation in Europe) valued at around $1,000,000 of each (20) invented Fashion Accessories, Interior Designs Home Furnishing Wall Panels, Andy Warhol and other expensive Artwork, my clients orders and expensive EU Inventory was sold without a payment. Total loss is $1.5,000,000 due to defendant's failure to pay storage bill in time.

4. Defendants are violating my rights in two ways.

5. First, HRA is wrongfully failing to meet its obligation to process SNAP and Cash Assistance applications and recertifications.

6. In August 2022, HRA failed to timely process *half* of all SNAP applications in New York City. As a result, thousands of New York City households eligible for SNAP benefits are deprived of essential subsistence benefits to which they are entitled until HRA processes their cases and issues these critical benefits.

7. That same month, in August 2022, HRA failed to timely process over *one-third* of Cash Assistance applications.

8. By the end of December 2022, over 28,000 Cash Assistance/SNAP applications were overdue and, of these, 5,711 of these were overdue dating back to September 2022. Through no fault of their own, here I did not receive the benefits to which I am entitled to.

9. HRA also fails to allow households to recertify their eligibility for benefits which they must do regularly in order to continue to receive benefits. Thousands of New York City households receiving

SNAP and Cash Assistance benefits discover their benefits have stopped because Defendants fail to process the recertification paperwork required to continue those benefits.

10. This occurs without notice or explanation—these households simply stop receiving benefits. During the unlawful delay until HRA gets around to processing applicant's cases and issuing benefits, many households receive no substitute benefits or food.

11. Second, HRA fails to maintain a functional system to allow those seeking SNAP and Cash Assistance benefits to apply or recertify for those benefits.

12. Thousands of low-income New Yorkers go without SNAP and cash benefits to which they are entitled because their applications and recertifications fall through the cracks of Defendant's broken automated administrative processing systems.

13. Both applications and recertifications are impeded and blocked altogether by the online processing system, and there are no reliable and accessible alternatives to the online system. Even when households are able to submit documents, those documents are often lost or ignored, and household members cannot reach the agency via the outdated and overwhelmed central phone line.

14. Further, HRA fails to schedule required eligibility interviews and to provide accessible and reliable processes by which households can complete required eligibility interviews.

15. I bring this action to challenge Defendant's systemic failures that deprive eligible households of SNAP and Cash Assistance benefits to which they are entitled.


## JURISDICTION AND VENUE

16. This action is brought under 42 U.S.C. § 1983 to redress the deprivation of federal statutory and constitutional rights. Jurisdiction is conferred by (a) 28 U.S.C. § 1331, which provides for jurisdiction in the United States district courts over civil actions arising under the Constitution, laws, or treaties of the United States; (b) 28 U.S.C. § 1343(a)(3), which provides for jurisdiction in the United States district courts over civil actions to redress deprivation of rights secured by the Constitution of the United States; and (c) the principles of pendent jurisdiction, including 28 U.S.C. § 1367. Venue is proper in this court pursuant to 28 U.S.C. § 1391. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure and by the Court's equitable authority.


## PARTIES

I, **Sehra Waheed "Plaintiff appearing as Pro-Se"** in this case being duly sworn, deposes & says:

17. Plaintiffs, Sehra Waheed is the resident of the State of New York.

18. The Human Resources Administration (HRA) is the nation's largest social services agency and assists over three million low-income and vulnerable New Yorkers annually through the effective and

efficient administration of more than 12 major public benefits programs, which reflects this Administration's priority of addressing poverty and income inequality.

19. Defendant City of New York is a municipal corporation organized pursuant to the laws of the State of New York and is a city social services district responsible for the assistance and care of any person in its territory "who is in need of public assistance and care which he is unable to provide for himself." NY Soc. Serv. Law § 62(1); *see also* N.Y. Soc. Serv. Law § 56.

20. The New York City Department of Social Services (DSS) is comprised of the administrative units of the NYC Human Resources Administration (HRA) and the Department of Homeless Services (DHS). Through integrated management for HRA and DHS, client services can be provided more seamlessly and effectively. The City leverages shared services functions across agencies, which results in better day-to-day management and building an integrated mission across agencies.

21. The Human Resources Administration (HRA) is dedicated to fighting poverty and income inequality by providing New Yorkers in need with essential benefits such as Food Assistance and Emergency Rental Assistance. As the largest local social services agency in the country, HRA helps more than three million New Yorkers annually through the administration of more than 15 major public assistance programs.

22. New York City Human Resources Administration ("HRA"), the executive agency of the City of New York within the Department of Social Services which has responsibility for the operation and administration of the SNAP and Cash Assistance programs for New York City residents. He is sued in his official capacity.

23. Molly Wasow Park was appointed by Mayor Eric Adams as the Commissioner of the New York City Department of Social Services (DSS), which oversees both the Human Resources Administration (HRA) and Department of Homeless Services (DHS), in April of 2023.

24. Scott French serves as the Administrator of the Human Resources Administration (HRA) within the Department of Social Services (DSS). Reports to DSS Commissioner Park.


## ALLEGATIONS

---

I, **Sehra Waheed "Plaintiff appearing as Pro-Se"** bring this action as a resident of New York.

25. Since January 1st, 2022, applied or recertified, attempted to apply or recertify, are applying or recertifying, or will apply or recertify for SNAP and/or Cash Assistance benefits; and for whom HRA has not or will not timely process such applications or recertifications, or who have been or will be unable to complete their applications or recertifications due to HRA's systems, policies, practices, and procedures.

26. Each month, thousands of households attempt to apply or recertify for SNAP and/or Cash Assistance benefits. As more fully referenced in paragraphs 113–16 of the Complaint, HRA's data reveal that the agency's SNAP Application Timeliness rate defined as application processing completed by the agency in the federally required 30-day timeframe was only 60. 1% percent for the City fiscal year 2022 (the year ending June 30, 2023) and only 49 percent in August 2023.

27. HRA has failed to timely process the SNAP and Cash Assistance applications and recertifications of thousands of individuals, resulting in myself suffering delays in the receipt of my benefits.

28. Data from HRA reveal that the processing delays are extensive. In August 2022, HRA failed to timely process over one-third of Cash Assistance applications, a timeliness rate of 65.4 percent. And as of December 28, 2022, over 28,000 Cash Assistance/SNAP applications were overdue, and of these, 5,711 of these were overdue dating back to September 2022.

29. Because many applicants of HRA are unable to complete applications and recertifications for SNAP and/or Cash Assistance benefits each month due to flaws in Defendant's policies, procedures, and systems, the identity of many members is unknown to me and, therefore, joinder is impracticable.

30. There are numerous questions of fact and law common including whether:

31. a) Defendants are failing to process initial applications and recertifications for SNAP and/or Cash Assistance benefits pursuant to the timeframes required by law; and

32. b) Defendants are using systems that impose barriers that inhibit or prevent SNAP and/or Cash Assistance benefit households from completing applications and required recertifications in order to receive the SNAP and/or Cash Assistance benefits to which they are lawfully entitled.

33. (c) I sought to apply or recertify for SNAP and/or Cash Assistance and did not have my claim processed in a manner to ensure timely receipt of SNAP and/or Cash Assistance benefits; or

34. (d) have been prevented from applying and/or rectifying because of flaws in HRA's policies, procedures, and systems.

35. Declaratory and injunctive relief are appropriate with respect to the Class as a whole because Defendants have acted on grounds applicable to the Class.

36. I am appearing as a Pro-Sey in this action as I am unable to pay legal fee or obtain a service by experienced attorneys Legal Aid Society, the New York Legal Assistance Group.

37. An action is superior to other available methods for a fair and efficient adjudication of this matter.


## STATUTORY AND REGULATORY SCHEME

---

38. A web of federal and state statutes and regulations establishes Defendant's obligations to ensure that eligible New Yorkers can apply for and complete recertifications for SNAP and Cash Assistance benefits. This framework also establishes clear timelines under which Defendants must process these recertifications and applications of the Supplemental Nutrition Assistance Program ("SNAP") Program

39. In 1964, Congress established the federally funded, state-administered Food Stamp Program in order to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," and to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." *7 U.S.C. § 2011; see also 7 C.F.R. § 271.1.*

40. In 2008, this federal Food Stamp Program was renamed the Supplemental Nutrition Assistance Program, and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 ("SNAP

Act"). *Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1651, 1853-59 (2008).*

41. Regulations promulgated by the Food and Nutrition Service of the United States Department of Agriculture ("USDA") implement the SNAP Act, applicable to all agencies administering SNAP programs. *See 7 U.S.C. §§ 2013(c); 2020 (e)(6)(A).*

42. SNAP eligibility is restricted to low-income households whose net income falls below the federal poverty line. *7 U.S.C. § 2014(c); 7 C.F.R. § 273.9(a)(2).* In 2022, the federal poverty line is $1,133 per month for a single adult, and $1,920 for a family of three. *See Upstate and NYC – Updated Supplemental Nutrition Assistance Program (SNAP) Standards for October 2022*, New York State Office of Temporary and Disability Assistance ("OTDA") *(Sep. 22, 2022)available at https:// otda.ny.gov/policy/gis/2022/22DC088.pdf.*

43. The maximum SNAP benefit is adjusted on an annual basis by USDA each October. For the period October 1, 2022, through September 30, 2023, the maximum monthly benefit for one person is $281, and for a family of three is $740. *7 C.F.R. § 273.9(a)(3); See also SNAP-Fiscal Year 2023 Cost-of-Living-Adjustments, Food & Nutrition Serv. (Aug. 9, 2022) available at https://www.fns.usda.gov/ snap/fy-2023-cola.*

44. Although SNAP is a federally funded program, state agencies are responsible for administering the benefit within each state. *7 U.S.C. § 2020 (a)(1); 7 C.F.R. § 271.4.*

45. In New York State, local social service districts—including Defendant City of New York and its mayoral agency—HRA are the administering agencies tasked with implementing the SNAP program under state law. *N.Y. Soc. Serv. Law § 95(3); see also N.Y. Soc. Serv. Law §§ 2(10) & 56, 61-62; New York City, N.Y., Charter §§ 601–604.*

46. The New York Social Services Law and the regulations of the New York State Office of Temporary and Disability Assistance ("OTDA") also include provisions related to the administration of the SNAP program in New York.

47. SNAP Processing Deadlines. SNAP administering agencies must provide SNAP benefits to eligible applicants as soon as possible but no later than 30 calendar days after the application is submitted. *7 U.S.C. § 2020(e)(3); 7 C.F.R. § 273.2 (g)(i).* The length of time SNAP administering agencies have to deliver SNAP benefits to eligible households is measured from the date the application is filed in the SNAP office. *7 C.F.R. § 273.2(g).*

48. Additionally, households in immediate need must be provided benefits no later than 7 days after the date of application. *7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2 (i).* This expedited service is available to households with less than $150 in monthly gross income and less than $100 in liquid resources; households whose combined monthly gross income and liquid resources are less than their monthly rent and utilities; and households consisting of destitute migrant or seasonal farmworkers with less than $100 in liquid resources. *7 U.S.C. § 2020(e)(9)(A)(i); 7 C.F.R. § 273.2(i).*

49. SNAP administering agencies must screen all SNAP applicants to determine if they meet the criteria for issuance of expedited SNAP benefits. *7 U.S.C. § 2020(e)(9), 7 C.F.R. § 273.2(i)(2).* Initial Applications for SNAP Benefits. SNAP administering agencies must provide "timely, accurate, and fair service to applicants for, and participants in" the SNAP program. *7 U.S.C. § 2020(e)(2)(B)(i).*

50. Specifically, SNAP administering agencies must permit applicants to file an application for SNAP benefits on the first day that households contact their local SNAP administering agency. Indeed, SNAP administering agencies must "encourage" applicants to file an application the same day the household or its representative contacts the SNAP office in person or by telephone and expresses

interest in obtaining SNAP or expresses concerns that indicate food insecurity. *7 U.S.C. § 2020(e)(2) (B)(iii); 7 C.F.R. § 273.2(c)(2)(i); See also id.§ 273.2(c)(1)(ii).*

51. SNAP households may file an application by submitting forms in person, through an authorized representative, by mail, by completing an online application, or by fax or telephone or "other electronic transmission." *7 C.F.R. § 273.2(c)(1)(i).*

52. All SNAP households have the right to apply in writing; SNAP administering agencies shall not deny or interfere with a household's right to apply for SNAP in writing. *7 C.F.R. § 273.2 (c)(1)(ii).*

53. SNAP administering agencies must make application forms "readily accessible" to potentially eligible applicants and must make paper applications "readily accessible and available" even if the administering agency also accepts applications through other means. *7 C.F.R. §§ 273.2(c)(3)(i)-(ii).*

54. Regardless of the type of system the SNAP administering agencies use, agencies must provide a means for applicants to immediately file an application that includes only their name, address, and signature. *7 C.F.R. § 273.2(c)(3)(i)*

55. Where an applicant requests an application by telephone, SNAP administering agencies must mail an application form to that household on the same day the telephone request is made. *7 C.F.R. § 273.2(c) (2)(i).*

## SNAP APPLICATIONS ELIGIBLILITY INTERVIEWS

56. Once a household has submitted an application for SNAP benefits, SNAP administering agencies must conduct an interview of that household to determine the household's eligibility for SNAP benefits and must verify certain information related to their eligibility, such as their income, expenses, and identity. *7 C.F.R. §§ 273.2(d)(1), (f).*

57. SNAP administering agencies must either interview SNAP applicants on the day they submit their application or must schedule an interview as promptly as possible to ensure eligible households receive an opportunity to participate within 30 days after application is filed. *7 C.F.R. § 273.2(e)(3).*

58. SNAP administering agencies must inform each applicant of the opportunity for a face-to-face interview at the time of application and recertification and grant a face-to-face interview to any household that requests one at any time, even if the State agency has elected the option to routinely provide telephone interviews. *7 C.F.R. § 273.2(e)(2)(i).*

59. If a SNAP applicant misses a scheduled interview, the SNAP administering agency must notify the applicant that the applicant is responsible for rescheduling the interview. If the applicant contacts the administering agency within the 30-day period following submission of their application, the administering agency must reschedule the interview. Even if the applicant fails to appear for the first scheduled interview, the administering agency may not deny an application because the applicant missed an interview prior to the 30th day after it is filed. *7 C.F.R. § 273.2(e)(3).*

60. SNAP administering agencies may not deny an applicant SNAP benefits based on a refusal to cooperate with the interview requirement unless the household is able to cooperate with that requirement but has demonstrated that it will not. A household cannot be denied for merely failing to appear for an interview. *7 C.F.R. § 273.2(d)(1).*

## SNAP APPLICATION ELIGIBILITY VERIFICATION

61. As part of the application process, SNAP applicants must also verify certain information related to their eligibility, such as their income, expenses, and identity. At the time of application, SNAP administering agencies must provide "a clear written statement explaining what acts the household must perform to cooperate in obtaining verification and otherwise completing the application process." *7 U.S.C. § 2020(e)(3).*

62. In addition, the notice must inform the household of the agency's duty to assist the household in obtaining required verification and must include "examples of the types of documents the household should provide and explain the period of time the documents should cover." *7 C.F.R. § 273.2(c)(5), (f)(5).*

63. SNAP administering agencies must give applicants at least 10 days to provide the required verification information. *7 C.F.R. §§ 273.14(b)(4), 273.2(f).*

64. Once an applicant has completed the above-described steps submitting an application, participating in an interview, and submitting verification documentation—the SNAP administering agency must process that application and, if the applicant is eligible, begin to provide SNAP benefits to that applicant.

## SNAP RECERTIFICATIONS APPLICATIONS FOR RECERTIFICATION

65. SNAP benefits do not last indefinitely. SNAP administering agencies must assign SNAP recipients to a "certification period" a specified period of time for which the recipient will continue to receive monthly SNAP benefits. *7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.10(f).*

66. For a household to continue to receive uninterrupted SNAP benefits after the expiration of their certification period, a SNAP household must complete *another* SNAP application called a "recertification"—and be found eligible within certain deadlines. *7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.14 (a).*

67. As with initial SNAP applications, administering agencies must comply with timelines for processing recertifications and providing SNAP benefits. If a household submits an application for recertification by the fifteenth day of the last month of the certification period and is still eligible for SNAP benefits, the SNAP administering agency must ensure that the household's benefits continue uninterrupted. *7 U.S.C. § 2020(e)(4); 7 C.F.R. §§ 273.14(c)(2), (d).*

68. If an eligible household files an application for recertification before the end of the certification period but the recertification process cannot be completed within 30 days after the date of application because of administering agency fault, the agency must continue to process the case and provide a full month's allotment for the first month of the new certification period. *7 C.F.R. §§ 273.14(e)(2), (d).*

## SNAP RECERTIFICATIONS PROCESS, APPLICATIONS,
## INTERVIEWS AND VERIFICATIONS

69. The SNAP recertification process includes the same three steps as an initial SNAP application: an application; an interview; and verification. Before the start of the last month of the household's certification period, the SNAP administering agency must provide the household with a Notice of Expiration listing the date the household's certification period expires, advising the household that it must submit an 12 application for recertification in order to renew its eligibility, and stating the date by which the household must submit the application for recertification in order to receive uninterrupted SNAP benefits (the 15th day of the last month of the certification period). *7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.14(b)(1).*

70. The SNAP administering agency must conduct interviews for recertification consistent with the interview requirements. Thus, as with initial SNAP applications, if a SNAP applicant misses a scheduled interview, the SNAP administering agency must notify the applicant that they are responsible for rescheduling the interview. If the applicant contacts the administering agency and requests an interview, the SNAP administering agency must schedule one. *7 C.F.R. §§ 273.14(b)(3), 273.2(e)(3).* And the administering agency must schedule interviews so that the household has at least 10 days after the interview to provide verification before the certification period expires. *7 C.F.R. § 273.14(b)(3)(iii).*

71. The SNAP administering agency must provide rectifying households with notices of required verifications and the due date for such verifications and give the household at least 10 days to provide the required information. *7 C.F.R. § 273.14(b)(4).*

## NOTICE AND HEARING RIGHTS PERTAINING
## TO SNAP APPLICATIONS AND RECERTIFICATIONS

72. SNAP administering agencies must provide any household aggrieved by an action of the agency that affects the participation of the household in SNAP with the opportunity for a fair hearing to challenge that action. *7 U.S.C. § 2020(e)(10); 7 C.F.R. § 273.15(a).*

73. When SNAP administering agencies propose to reduce or terminate a household's SNAP benefits during its certification period, the agency must provide the household with timely and adequate notice and the opportunity for a fair hearing and continued benefits until the hearing decision is issued. *7 U.S.C. § 2020(e)(10) (implemented by 7 C.F.R. §§ 273.13, 273.15).*

74. Such notices of a reduction or termination of benefits must explain in easily understandable language, *inter alia*, the proposed action; the reason for the proposed action; the household's right to request a fair hearing; and the availability of continued benefits; and they must be mailed out at least ten days before the date upon which the adverse action becomes effective. *7 U.S.C. § 2020(e)(10); 7 C.F.R. §§ 273.13(a)(1)-(a)(2).*

75. SNAP administering agencies must provide applicants with a written notice of eligibility or denial as soon as a determination is made, "but no later than 30 days after the date of the initial application." *7 C.F.R. § 273.10(g)(1)*. Furthermore, SNAP administering agencies must provide households that have filed an application by the 15th of the last month of their certification period with either a notice of eligibility or a notice of denial by the end of their current certification period if the household has complied with all recertification requirements. *7 C.F.R. § 273.10(g)(2)*.

76. When SNAP administering agencies delay processing a household's initial application or application for recertification, the agency must send written notice to the household informing it, *inter alia*, that processing of the application has not been completed. *7 C.F.R. §§ 273.2(h), 273.10(g)(1)(iii)*.

77. When delay in a household's application or application for recertification is the fault of the SNAP administering agency, the agency must take immediate corrective action. *7 C.F.R. § 273.2(h)(3)(i)*.


## THE CASH ASSISTANCE PROGRAM

78. Separately from the federal benefits available through SNAP, New York State has established two Cash Assistance programs: Family Assistance, which is available to families with a child under 18 and to pregnant women; and Safety Net Assistance Cash Assistance, which is available to adult-only households and households with children that are not able to receive Family Assistance. *N.Y. Soc. Serv. Law §§ 158, 349*. These programs are collectively referred to as "Cash Assistance." The New York Social Services Law and the regulations of OTDA also include provisions related to the administration of Cash Assistance in New York.

79. Like SNAP benefits, Cash Assistance benefits are administered by local social service districts in the state including Defendant City of New York and its mayoral agency, *HRA. N.Y. Soc. Serv. Law § 95(3); See also N.Y. Soc. Serv. Law §§ 2(10), 56 & 61-62; New York City, N.Y., Charter §§ 601–604*.

80. For a household to be eligible for Cash Assistance, the Cash Assistance administering agency must determine that the household's assistance does not exceed the "standard of monthly need." *N.Y. Soc. Serv. Law § 131-a(1)*. In New York City, the typical standard of monthly need amount is $789.00 for a family of three and $398.10 for a single adult. *N.Y. Soc. Serv. Law §§ 131-a(2)(a-4), (3)(c), (3-d); 18 N.Y.C.R.R. § 352.3*.


## INITITAL APPLICATIONS FOR CASH ASSISTANCE PROGRAM

81. Like SNAP benefits, an applicant for Cash Assistance must complete an initial application, an interview, and satisfy verification requirements. Cash Assistance applications must be acted on promptly and without delay. *18 N.Y.C.R.R. §§ 350.3(b), 351.1(c)(1)*. Social services districts must reach a conclusion on an applicant's eligibility for Cash Assistance within 30 days after the initial application is filed. *N.Y. Soc. Serv. Law § 158(4) (Safety Net Assistance); 18 N.Y.C.R.R. §§ 369.6(a) (Family Assistance)*.

82. As with SNAP applications, an interview is required to establish eligibility for Cash Assistance. Cash Assistance interviews "must ordinarily be scheduled within seven working days, except when there is indication of emergency need, in which case the interview must be held at once." *18 N.Y.C.R.R. § 350.3(c).* Cash Assistance applicants may apply simultaneously for SNAP benefits, in which case the SNAP eligibility interview shall be conducted at the same time as the interview for Cash Assistance and if not conducted on the day they apply, must be scheduled on a specific day and at a specific time. *18 N.Y.C.R.R. § 387.7(a).*

83. The Cash Assistance administering agency may provide the option to allow an interview via telephone or other digital means—but that option must be "at the request of the applicant or recipient." *N.Y. Soc. Serv. Law § 134-a (3); 18 N.Y.C.R.R. § 350.3(c).* If the Cash Assistance administering agency elects to provide telephone or other digital interview options, each applicant or recipient must be notified in writing of the time and date of the interview and given the option to request their preferred interview method. *N.Y. Soc. Serv. Law § 134-a (3); 18 N.Y.C.R.R. § 387.7 (a); See also OTDA 22-ADM-10 at 2-3 (July 19, 2022) available at https://otda.ny.gov/policy/directives/ 2022/ADM/22-ADM-10.pdf.*

84. As with SNAP benefits, applicants for Cash Assistance must also verify certain information related to their eligibility, such as their income, expenses, and identity and the administering agency has a duty to assist with securing such verification. *18 N.Y.C.R.R.§§ 351.2, 350.7.* Households who apply simultaneously for Cash Assistance and SNAP benefits must have their applications processed for SNAP purposes in accordance with SNAP procedural, timeliness, notice, and fair hearing requirements. Any delays in processing of the application for Cash Assistance may not result in any delay in the processing of the SNAP application. *7 C.F.R. 273.2(j)(1)(iii).*

## THE CASH ASSISTANCE RECERTIFICATION PROGRAM

85. As with SNAP benefits, households that receive Cash Assistance benefits must recertify their eligibility for these benefits at specified intervals in a process known as recertification. The process includes a reevaluation and reconsideration of all factors of need and eligibility. *18 N.Y.C.R.R. § 351.20.* To recertify Cash Assistance households, Cash Assistance administering agencies must, *inter alia*, (1) allow recipients to complete a recertification form, (2) interview the recipient, and (3) verify the recipient's continued eligibility. *18 N.Y.C.R.R. § 351.20.*

86. Recertification interviews can be conducted either by an in person, face-to-face interview, or by telephone or by other digital means, at the request of the recipient. *18 N.Y.C.R.R. § 351.22(a).* If a recipient fails to participate in an interview or comply with an agency-approved alternative recertification requirement without "good cause," the Cash Assistance administering agency must send a 10-day notice of proposed discontinuance of assistance. *18 N.Y.C.R.R. § 351.22(b).* If the recipient appears for a face to-face, telephone, or digital interview during the 10-day notice period, an interview must be arranged. If it is determined that the recipient is eligible for continued assistance, the 10-day notice of proposed discontinuance must be nullified. *18 N.Y.C.R.R. § 351.22(b).* If the recipient does not respond within this 10-day period, the case shall be closed as of the end of the 10-

day period. Any request for assistance made after a case is closed must be considered a new application. *18 N.Y.C.R.R. § 351.22(b).*

87. An applicant is exempt from complying with Cash Assistance recertification requirements if the applicant establishes that good cause exists. *18 N.Y.C.R.R. § 351.26(a).* The applicant is responsible for notifying and informing the Cash Assistance administering agency of the reasons for failing to comply with a recertification eligibility requirement, and to furnish 17 evidence in support of any claim of good cause. *18 N.Y.C.R.R. § 351.26(b).* "Good cause" exists when a physical or mental condition prevents compliance, the failure to comply is directly attributable to social services district error, or extenuating circumstances beyond the control of the household prevent the household from being reasonably expected to comply. *18 N.Y.C.R.R. § 351.26(a)(1)-(3).*

## SNAP AND CASH ASSISTANCE ADMINISTRATION IN NEW YORK CITY

88. HRA is required to comply with federal statutory requirements for processing SNAP benefits— including the statutory timeframes for acting upon SNAP applications and recertifications. When an applicant first applies for SNAP benefits, they do not receive those benefits until HRA has processed their application. Similarly, when HRA fails to meet statutory timelines to rectify a household for SNAP benefits, the SNAP benefits stop on the last date of the certification period.

89. Defendants the City of New York, Miss Wascow and Mr French who run HRA and the Department of Social Services which oversees HRA, are therefore responsible for ensuring that HRA meets its legal obligations. For a period of time after COVID-19 struck New York City in March 2020, HRA was not required to comply with statutory requirements to conduct SNAP recertifications because the agency received temporary waivers from USDA pursuant to the Families First Coronavirus Response Act to suspend recertification requirements by extending SNAP certification periods to ensure that families could continue participating in or apply for SNAP during the public health and economic crisis. *See New York: COVID-19 Waivers and Flexibilities, Food & Nutrition Serv. (last updated Jan. 4, 2023) available at https://www.fns.usda.gov/disaster/pandemic/covid-19/new-york.*

90.  These original waivers extending recertifications have now expired. *See 21 TA/DC047 Upstate and New York City, OTDA, at 3 (June 30, 2021) available at https://otda.ny.gov/policy/gis/ 2021/21DC047.pdf* ("The availability of six-month SNAP certification period extension waivers for cases expiring through March 31, 2021 described in *GIS 20 TA/DC101* have not been extended."). Although HRA has received subsequent waivers permitting the agency to extend certain certification periods for specific periods of time, it has not received subsequent blanket waivers extending certification periods for all SNAP recipients. Therefore, HRA remains responsible for timely rectifying thousands of SNAP cases each month as required by federal law. But HRA is failing to process thousands of SNAP cases on time each month.

## CURRENT APPLICATION AND RECERTIFICATION PROCESS AT HRA

91. HRA maintains one process for handling both SNAP and Cash Assistance applications and recertifications, with limited exceptions. HRA policy provides that households who apply and rectify for SNAP and/or Cash Assistance can apply or rectify: (1) in person at an HRA office; (2) through HRA's online system, known as ACCESS HRA; (3) by requesting an application form, completing it, and submitting it by mail, fax, or in person at an HRA office; (4) by telephone; or (5) by home visit, if necessary. *See SNAP Benefits and COVID-19, HRA, https://www.nyc.gov/site/hra/help/snap-benefits-food-program.page; Coronavirus (COVID-19) Alert, HRA available at https://portal.311.nyc.gov/article/?kanumber=KA-03115 (last visited Jan. 27, 2023); See also Center Director Memorandum 20-19, HRA (July 24, 2020), available athttp://onlineresources.wnylc.net/nychra/docs/cd__20-19.pdf.*

92. HRA administers SNAP and Cash Assistance through three types of centers located in the five boroughs of New York City: SNAP-only Centers, HIV/AIDS Services Administration Centers ("HASA Centers"), and Benefits Access Centers. SNAP-only Centers process and manage initial and ongoing eligibility for applicants seeking only SNAP benefits ("SNAP-only cases"). Benefits Access Centers process and manage initial and ongoing eligibility for joint Cash Assistance and SNAP cases as well as Cash Assistance-only cases. HASA Centers process and manage initial and ongoing eligibility for joint Cash Assistance and SNAP cases as well as Cash Assistance-only cases, and provide additional services, for individuals living with HIV/AIDS and members of their households.

93. Those households who apply for both Cash Assistance and SNAP benefits apply via the same joint application.

94. Applicants who apply online do so via ACCESS HRA, a program that allows users to apply and recertify for HRA-administered benefits, including SNAP and Cash Assistance, via website or mobile phone application. Applicants are encouraged to submit documents required to complete an application or recertification by uploading them on the ACCESS HRA Mobile App. *See SNAP Benefits and COVID-19, HRA available at https://www.nyc.gov/site/hra/help/snap-benefits- food-program.page.*

95. Neither ACCESS HRA nor the ACCESS HRA Mobile App provide live support to users by telephone, text or otherwise. Users are instructed to email ACCESS HRA. *See ACCESS HRA Frequently Asked Questions, HRA, https://www.nyc.gov/site/hra/help/access-hra- frequently-asked-questions.page.*

## HRA INTERVIEW AND VERIFICATIONS PROCESSES
## FOR SNAP AND CASH ASSISTANCE BENEFITS

96. SNAP-only households utilize an interview process known as "On Demand," by which applying or rectifying households call HRA to complete mandatory interviews. *See Center Director Memo 22-12, HRA (May 23, 2022), available at http://onlineresources.wnylc.net/nychra/showquestion.asp? fldAuto=2943.* ("The purpose of this Center Directive (CD) memorandum is to inform Non-Cash

Assistance (NCA) Supplemental Nutrition Assistance Program (SNAP) staff that On-Demand SNAP telephone interviews will resume on June 1, 2022."). Households seeking both SNAP and Cash Assistance benefits are not permitted to call HRA to receive an interview on demand. They also do not receive interview appointments for in person or telephone interviews. Instead, HRA policies provide that an HRA staffer will telephone the household to conduct an interview over the phone. *See Policy Bulletin 21-09-ELI, HRA, at 3 (Feb. 28, 2021) available at http://onlineresources.wnylc.net/ nychra/docs/pb__21-09- eli.pdf.* However, HRA does not notify households of the specific time, or even the specific date, when HRA will call to conduct the interview. Instead, the recertification form sent to these households merely informs them that they will receive a call within 10 days.

97.  HRA policy provides that HRA will request all necessary documentation to establish eligibility at the interview. HRA then provides a form listing the required documentation, which is available to the participant. HRA policy provides that the agency has a duty to assist applicants with obtaining documentation needed to verify eligibility and that HRA staffers have an obligation to determine if a document is already on file. *See See Policy Bulletin 16-04, HRA (Jan. 8, 2016) available at http:// onlineresources.wnylc.net/nychra/docs/16-04-ope.pdf.* In reality, HRA staff do not assist applicants with obtaining documentation.

## DEFENDANTS' FAILURES TO TIMELY PROCESS SNAP AND CASH ASSISTANCE APPLICATIONS AND RECERTIFICATIONS DEPRIVE NEW YORK CITY HOUSEHOLDS OF ESSENTIAL SUBSISTENCE BENEFITS

98.  Defendants are depriving SNAP and Cash Assistance households of the SNAP and Cash Assistance benefits to which they are entitled in two major ways: (1) by failing— entirely due to agency delay— to meet SNAP and Cash Assistance application and recertification processing deadlines, and (2) by failing to maintain functional systems to allow SNAP and Cash Assistance applicants to complete applications and recertification for these crucial benefits. Both failures have the same result: Households are not receiving benefits to which they are entitled, resulting in hunger and immense distress.

## HRA FAILS TO COMPLY WTH SNAP AND CASH ASSISTANCE PROCESSING DEADLINES

99.  Defendants have engaged in a consistent pattern of severe non-compliance with laws requiring the processing of initial applications and mandatory rectification applications for SNAP and Cash Assistance benefits within the applicable timeframes. As a result, they deprive New York City families of benefits to which they are entitled.

## HRA'S FAILURE TO TIMELY PROCESS
## SNAP APPLICATIONS AND RECERTIFICATIONS

100. HRA fails to process SNAP applications and applications for recertification within the timeframes required by federal statute and regulations. When HRA fails to timely process a household's SNAP recertification, that household's benefits stop. As a result of HRA's failure to process SNAP recertifications, and in contravention of their obligation to do so. *See supra at ¶¶ 55-72,* thousands of New York City households who rely on SNAP benefits have lost these benefits, through no fault of their own, despite continuing need and eligibility. In addition to failing to process SNAP recertifications, HRA is also failing to process SNAP applications. Thousands of New York City households who have applied for SNAP benefits have not had their applications processed. As a direct result of HRA's inaction, these households are deprived of benefits to which they are legally entitled, which they desperately need to feed themselves and their families.

101. Defendant's own data reporting demonstrates this severe non-compliance with SNAP processing deadlines. For the City fiscal year 2022 (the year ending June 30, 2022), HRA data reveal that SNAP Application Timeliness—defined as application processing completed by the agency in the federally required 30-day timeframe—was only 60.1%. *See Dynamic Mayor's Management Report, New York City Mayor's Office of Operations, at 21 (last updated Nov. 7, 2022) available at https:// dmmr.nyc.gov/city-services/health-and-human-services/human-  resources-administration/4116 ("Mayor's Management Report").*

102. HRA has admitted its deficient performance, noting in the Mayor's Management Report that the Fiscal Year 2022 SNAP Application Timeliness rate of 60.1% represented a decrease of 30 percentage points compared to the prior year. Further, HRA's noncompliance with the SNAP application processing timelines is only getting worse: In July 2022 the SNAP Application Timeliness rate the was only 51.2% and in August 2022, the SNAP Application Timeliness rate was only 49%. Mayor's Management Report.

103. When HRA fails to meet statutory timelines to recertify a household for SNAP benefits, the SNAP benefits stop on the last date of the certification period; no new benefits are issued until the recertification is complete. However, despite the agency's legal obligation to send notices to SNAP households when there is agency delay. *See supra ¶ 71,* HRA does not notify households that their SNAP benefits will not be issued because of agency delays. Instead, households that have completed their recertification requirements, simply receive no SNAP benefits at all with no warning whatsoever when HRA has failed to timely process their recertifications. Moreover, these households have no way to learn when their benefits will resume. They are expected to go without benefits often for extended periods of time until HRA gets around to completing processing their cases.

## HRA'S FAILURE TO TIMELY PROCESS CASH
## ASSISTANCE APPLICATIONS AND RECERTIFICATIONS

---

104. HRA is also deficient in timely processing Cash Assistance applications. Data from HRA reveal that the delays are extensive for cases in which New Yorkers applied for Cash Assistance including applications in which the applicant sought both Cash Assistance and SNAP benefits (known as CA/SNAP cases), and those in which the applicant sought only Cash Assistance benefits. As of December 28, 2022, over 28,000 Cash Assistance/SNAP applications were overdue and, of these, 5,711 were overdue dating back to September 2022. With respect to timeliness for Cash Assistance only applications, the data reveal that the application timeliness rate for Cash Assistance-only was only 73.4% for July 2022, and, for the most recent month reported. April 2024, HRA failed to timely process over one-third of Cash Assistance applications, reporting a timeliness rate of 65.4%. Mayor's Management Report. When HRA fails to process applications for SNAP and Cash Assistance benefits, households desperate for subsistence level benefits are left without them waiting with no idea when HRA will get around to processing their applications.

## HRA's FAILURE TO TIMELY PROCESS EXPEDITED SNAP BENEFITS

---

105. Upon information and belief, HRA is also failing to timely process the most critical cases: those applicant households who are entitled to "Expedited SNAP" to have their SNAP benefits processed within seven days because they are in immediate need. As discussed, in order to qualify for expedited processing, these households (a) have less than $150 in monthly gross income and less than $100 in resources, (b) have combined monthly gross income and resources that are less than their monthly rent and utilities, or (c) are destitute migrant or seasonal farmworkers with less than $100 in liquid resources. Although HRA is required to provide SNAP benefits within seven days of an application for those who meet the criteria for expedited SNAP benefits the agency repeatedly fails to do so.

## HRA'S DYSFUNCTIONAL APPLICATION AND
## RECERTIFICATION SYSTEMS DEPRIVE HOUSEHOLD OF ESSENTIAL
## SNAP AND CASH ASSISTANCE BENEFITS

---

106. In addition to the processing problems described above, HRA also fails to meet its statutory and regulatory obligations in a second, distinct way: HRA's application and recertification systems and processes are so flawed that they prevent users from timely completing and submitting applications and recertifications, thereby depriving them of SNAP and Cash Assistance benefits to which they are entitled. Thousands of low-income New Yorkers go without benefits because of HRA's broken

systems: Their applications and recertifications are impeded and blocked altogether by a complex online processing system; the documents they submit are lost or ignored, and they cannot reach the agency via its outdated, overwhelmed, central phone line. As discussed SNAP and Cash Assistance applicants in New York City must (a) complete a form either an application or a recertification form and submit that form to HRA, (b) participate in an interview with HRA, and (c) submit verification documents to HRA. HRA's application and recertification processes are breaking down at each of these three steps. As a result, households are unable to recertify and apply for benefits, and so are being prevented from accessing SNAP and Cash Assistance benefits to which they are entitled.

## DEFENDANTS ARE SYSTEMITICALLY FAILING TO PROVIDE ACCESSIBLE MEANS TO SUBMIT APPLICATIONS AND RECERTIFICATIONS FOR SNAP AND CASH ASSISTANCE BENEFEFITS

107. As a result of HRA's flawed systems, policies and practices, many households are unable to successfully navigate the first step required to apply or recertify for SNAP and/or Cash Assistance: completing and submitting initial application and recertification forms. When households cannot submit an application or recertification form to HRA, their case does not proceed to the interview stage. If they are new applicants, they are unable to complete their application for benefits; if they are recertifying, their case will be closed for failure to submit a recertification form. *18 N.Y.C.R.R. § 350.4; 18 N.Y.C.R.R. § 351.20(b)(1); See also HRA Policy Bulletin 21-09 at 7-8 (describing HRA computer closing codes).* HRA advises households to apply and recertify online using ACCESS HRA, and to go in person to an HRA office only if their "needs cannot be met through ACCESS HRA or over the phone via the HRA information line." *See Important Information About COVID-19 and Your HRA Benefits, HRA (last updated Jan. 23, 2023) available at https://www1.nyc.gov/site/hra/ important-information-about-covid-19-and-your-hra-benefits.page (last visited January 27, 2023).* However, all these vehicles for applying and recertifying utilizing ACCESS HRA, calling Infoline, and going in person to an HRA office pose significant barriers to households who need to apply or recertify. And unfortunately, there are no accessible alternatives to these methods to applying or recertifying.

108. First, ACCESS HRA, the online system by which households may apply and recertify for SNAP and Cash Assistance benefits, causes widespread problems for SNAP and Cash Assistance households, preventing households from completing and submitting initial applications and recertifications in a timely manner. Despite its name, ACCESS HRA is inaccessible to many households because they lack internet access or digital skills, or they encounter other barriers related to disabilities or language access. In April 2024, about 30 percent of New York City residents, or 2.2 million individuals, lacked broadband Internet access, including 350,000 who only access internet through cell phones or tablets. *See Scott Stringer, Census and the City: Overcoming New York City's Digital Divide in the 2020 Census, Office of the New York City Comptroller, at 5 (July 2019) available at — https:// c o m p t r o l l e r . n y c . g o v / w p - c o n t e n t / u p l o a d s / d o c u m e n t s / C e n s u s _ a n d _ . The_City_Overcoming_NYC_Digital_Divide_Census.pdf.*

109. Even applicants with access to the internet are often unable to successfully navigate ACCESS HRA because they lack the technical skills necessary to complete an online application or recertification on their own. Because HRA does not provide any real-time support for ACCESS HRA, those households who encounter ACCESS HRA barriers are unable to receive real-time help from HRA to overcome these barriers. Neither ACCESS HRA nor the ACCESS HRA Mobile App provide live support to users by telephone, text, or otherwise. Those who can access ACCESS HRA also face barriers. Many households encounter flaws in the ACCESS HRA software; some are affirmatively blocked from recertifying and given misinformation. For example, some households log in to ACCESS HRA after receiving a notice instructing them to recertify online, only to receive a system message informing them that they cannot recertify.

110. In some cases, households that attempt to recertify on ACCESS HRA are advised by the system that "no recertification is due," even though their recertification *is* due and if it is not completed, the household will lose benefits. When these households rely on the information provided by ACCESS HRA and therefore do not take any other steps to recertify, their cases close for failure to recertify. Households whose cases close for failure to recertify after they rely on the ACCESS HRA message informing them that "no recertification is due" are not made whole. Even if they later manage to get their cases reopened, they suffer a gap in benefits. HRA does not pay them retroactive benefits to the date their cases were closed for failure to recertify. Further, HRA instructs applicants who cannot use ACCESS HRA to call Infoline for help applying or recertifying for benefits. However, due to the phone system's limited capacity, callers are subjected to long wait times and dropped calls because of system overload. Even if a caller gets through, Infoline does not provide support for ACCESS HRA. Callers who ask for help from Infoline are told to go to an HRA office to apply or recertify.

111. Although HRA policy provides that applications and recertifications can be completed over the phone, Infoline agents do not accurately advise applicants of that option. Households who encounter barriers to using ACCESS HRA and Infoline cannot necessarily resolve these issues by going to HRA offices, because even those applicants who go to apply or recertify in person are directed to computer stations where they are instructed to use. ACCESS HRA to apply or recertify on their own. *See Policy Bulletin 21-09, HRA, at 6 (Feb. 28, 2021), available at http://onlineresources.wnylc.net/ nychra/docs/pb__21-09-eli.pdf (discussing revisions to Cash Assistance recertification due to COVID-19).*

112. In many cases, HRA lacks adequate staffing to assist individuals at computer stations who are attempting to apply or recertify for benefits. Those who are unable to navigate the computer stations at HRA offices are given paper forms and sent home to complete them on their own without assistance. Further exacerbating these problems is the fact that HRA's paper forms are byzantine, and so it is difficult to understand and complete HRA paper forms without assistance. It is not easy to discern which parts of these forms must be completed, what the questions mean and even where to sign the document. For instance, the SNAP and Cash Assistance application form requires three signatures on three different pages of the document. *See New York State Application for Certain Benefits and Services LDSS form 2921 available at https://otda.ny.gov/programs/applications/ 2921.pdf.* And, without going in person to an HRA office, it is increasingly difficult for households to even obtain a paper form, because HRA no longer mails these paper recertification forms to households that receive both Cash Assistance and SNAP benefits when they are required to recertify. Instead, HRA directs these households to use ACCESS HRA to complete their recertification form and advises those who lack internet access to call HRA or go in person to a center. *See HRA Notice W-908T "Don't Lose Your Benefits."* As described, these other systems are inaccessible and flawed.

113. Finally, HRA often fails to record submission of paper forms because HRA does not timely log incoming mail, faxes and paper forms submitted to HRA drop boxes at HRA offices. As a result, households who complete application and recertification forms often experience delays because HRA has failed to timely process these paper forms.

## DEFENDANTS ARE SYSTEMICALLY FAILING TO PROVIDE ACCESSIBLE MEANS FOR HOUSEHOLDS SEEKING SNAP AND CASH ASSISTANCE BENEFITS PARTICIPATE IN INTERVIEWS

114. Defendants also fail to maintain functional systems to allow households to successfully complete the second step in applying or recertifying for SNAP and/or Cash Assistance benefits: participating in an interview. Households face the following barriers: (1) Interview calls are unscheduled (not set for a particular timeframe or even a particular day); (2) the calls are often made weeks after the application or recertification form was submitted— delaying continued processing of the application or recertification; 3) the calls can easily be missed or mistaken for spam because many of the calls are made from unidentified phone numbers; 4) the calls cannot be returned and households are instead required to call Infoline and are often unable to get through. Even when callers do reach Infoline, they are only able to leave a message requesting a call back; they then face the same process all over again.

115. First, the calls are unscheduled; they are not set for a particular time or date. Despite the legal requirements that phone interviews must be scheduled as promptly as possible for a specific date and time, and that applicants must be given a choice of the form of interview (by phone or in person), HRA fails to provide these options for CA/SNAP households as required by *7 C.F.R. § 273.2(e)(3); 7 C.F.R. § 273.14 (b)(3), and N.Y. Soc. Serv. Law § 134-a (3)*. Instead, HRA staffers call the household at unscheduled, random times to conduct the interview by telephone.

116. Second, HRA does not comply with its obligations to conduct these requisite interviews in a timely manner thereby delaying processing and preventing households from successfully applying or rectifying for benefits. Indeed, some applicants do not receive the recertification interview phone call for weeks after submitting their recertification. Others report not getting calls at all.

117. Third, these interview calls are easily mistaken for spam calls and are easy to miss. HRA staff often make interview calls from telephones which are not identified as the City of New York, HRA, or DSS. As a result, many applicants do not answer these calls because they assume that calls from unidentified numbers are spam calls. Moreover, households can miss the calls when they run out of cell minutes, are out of cell range, or when they are unable to pick up the phone.

118. Fourth, the calls cannot be returned. Most of the phones used by HRA staffers to contact households cannot accept incoming calls. As a result, households are given a "rescheduling line" number to call to leave a message that they would like an interview. But the "rescheduling line" number is actually routed to the HRA's dysfunctional, overloaded central call line, Info line. As discussed *supra ¶ 132,* it is difficult to reach anyone via Infoline due to busy signals, dropped calls, disconnected calls, and long wait times. As a result, many applicants are unable to reach an agent to request another interview call. If applicants are lucky enough to reach an Infoline agent, they do not receive an interview they are merely put on a list to receive another unscheduled interview call, and the cycle

begins all over again. Moreover, HRA fails to provide meaningful alternatives to telephonic interviews that would mitigate the harm that this nonfunctional system causes. Despite its clear obligations to allow households to elect in person interviews, *See supra ¶ 87, 96,* HRA does not provide households with a choice between an in person or telephone interview. HRA policy provides that even applicants who go in person to Benefits Access Centers to recertify often do not receive in person interviews; instead, they are told they will receive a phone call within 10 days for their interview. *See Policy Bulletin 21-09, HRA, at 6 (Feb. 28, 2021) available at http:// onlineresources.wnylc.net/nychra/docs/pb__21-09-eli.pdf (discussing revisions to Cash Assistance recertification due to COVID-19).*

119. There is no effective way for applicants or recipients to secure an interview or get an appointed date or time for one. HRA either calls at an unscheduled time, without a way for applicants or recipients to reach HRA or remedy a missed call, or HRA does not call at all, and then denies or closes cases due to failure to complete the interview. Even when applicants appear in person at Benefits Access Centers and ask for an in person interview, HRA often does not honor such requests.

## DEFENDANTS ARE SYSTEMICALLY FAILING TO PROCESS VERIFICATIONS FOR SNAP AND CASH ASSISTANCE APPLICATIONS AND RECERTIFICATIONS

120. Defendants also fail to perform the third step in the SNAP and Cash Assistance application and recertification process: verification of information needed to establish eligibility. Specifically, HRA fails to process documents that applicants submit to support their applications and recertifications. As a result, households are erroneously denied or have their cases closed for not submitting required documentation. Households may submit verification documents to HRA in one of four ways: through the ACCESS HRA mobile phone app, by mail, by fax, or in person at an HRA center. None of these methods provides a reliable way for applicants to submit verification materials.

121. In addition, applicants often do not receive real-time receipts for the documents they submit: They must wait for receipts to be mailed to them after HRA processes the documents. Applicants who go in person to Benefits Access Centers do not receive real-time receipts for documents they have submitted. When HRA fails to process required documents, a household's case is closed for failure to provide verification. Because of HRA processing delays and errors, many applicants who have already submitted required documentation nonetheless have their cases closed in error by HRA for alleged failure to submit required verification documentation.

122. Indeed, HRA acknowledges delays and errors related to reviewing and indexing documents submitted by households. HRA explains on the FAQ page on its website that: "If you submitted your documents to HRA, it is possible that it has been received but it hasn't yet been added to your case file by an HRA worker." *See ACCESS HRA Frequently Asked Questions, HRA, available at https:// www.nyc.gov/site/hra/help/access-hra-frequently-asked- questions.page.*

123. Additionally, due to the failures of Infoline and routing applicants to ACCESS HRA, there is no effective way for applicants to communicate with HRA to figure out what documents are still due.

Applicants who attempt to avoid these ACCESS HRA pitfalls by submitting documents in person, by mail, or by fax often fare no better. Indeed, applicants who wish to submit documents in person are directed to scanners to upload the documents via ACCESS HRA. Moreover, even applicants who submit documents in person often do not receive real-time receipts for their submissions. Instead, they must wait for receipts to be mailed to them after HRA processes the documents.

124. Regardless of what submission method households choose, HRA often denies cases in error for failing to submit required documentation, even though HRA already has the required documentation in its possession. In addition, in many cases, HRA denies or closes cases in error when it has failed to assist households to secure the needed verification and failed to provide households with opportunities to submit other forms of verification to enable them to obtain benefits in a timely manner.

### PLAINTIFF SEHRA WAHEED'S ALLEGATIONS

125. I am a 45 year-old single woman going through disability due to serious trauma and health challenges from medical malpractice in 2018. I am an Artist, Interior Designer and Fashion Stylist by Profession and a graduate from Fashion Institute of Technology, currently residing alone in Manhattan, New York. I am unemployed. My current rent is approximately $4,200 per month.

126. My previous apartment rent at *845 United Nations Plaza Apt 18G New York, NY 10017* was $7,500 monthly that would have costed me half at $3,250 "after taxes". I fell behind on rent and requested HRA for available special grant help to pay rental arrears in 2023. I requested HRA for One Deal Shot Grant for Rental Arrears to stop eviction and pay back rent or even advanced rent and storage bill but my request was completely ignored.

127. As a result eviction was ordered by Honorable Judge Vanessa Fang in Manhattan Housing Court in November 2023 for non payment of rent, Marshall's warrant was issued on November 14th 2023 and I was evicted on December 7th, 2023.

128. First application for Emergency Safety Net Assistance (ESNA) Form 147-H, Case # 00038192917D For $90,000 year's up rent at $7,500 a month x 12 months = $90,000 was submitted on 11/6/2023.

129. Second application for Emergency Safety Net Assistance (ESNA) Form 147-H, Case # 00039574091D For $67,500 year's up front rent was submitted on 10/26/2023. The was a wrong amount because correct amount was $90,000 but would have helped with the rental payments.

130. Both Shelter Arrears Repayment Agreements were authorized and signed by M. Santana and M. Almonte and stated that "Note: This form is not valid unless the Applicant's signature is present." HRA representative confirmed that the application is deemed completed after applicant signs since it has already been approved by supervisor and why it was sent for applicants signature. I never received any payments on either of the applications after I signed and sent it back with all required documentation.

131. I have been renting storage since 2012 until 2020 and from 2021 to 2022. HRA paid the monthly storage fee directly to the storage foe 10 x 10 size between $565 to $850 with tax included. When I was served with eviction by the Landlord at 845 United Nations Plaza Apt 18G New York, NY 10017 in January 2023, I rented storage unit to place my suitcases only in one unit 4 x 6 and HRA paid $161.99 a month until August 2023 and after August 2023 it went unpaid accumulated with late fee

on past due amount. When I inquired, I was not given accurate information on the application and status of payments and never received any certified notices by mail.

132. I was scheduled for eviction with Marshall's warrant for move out on December 7th 2023 when Landlord attempted to cause me harm by not giving me "Reasonable amount of time" when she knew my movers were already at the location to pack and remove my belongings from the unit. She knew that the I was "Complying" with court order for a safe move-out yet she caused me harm in an attempted robbery by her movers to vandalize, damage steal and break my apartment furniture valued at $439,854,97. *Under the RPAPL §749; Real Property Law § 235* "When a tenant is evicted, the landlord must give the tenant a reasonable amount of time to remove all belongings; the landlord may "NOT" retain the tenant's personal belongings or furniture."

133. Landlord intentionally and maliciously "Schemed and Booked" a fraudulent moving company without proper court order and my consent. Moving company was not an operational entity, did not have any offices or storage facility listed online or business registered even with the New York Secretary of State. The phone numbers provided of the moving company connected to Capital One Bank and the movers hired were not professionals. Property owners in New York have a responsibility to keep their premises safe for residents, guests, and visitors and regardless of whether they are a guest, licensee, or trespasser. They must warn their guests of a potentially dangerous condition that is invisible to their senses.

134. Landlord and Trump Condomimum Building Management did not address my move with me in advance and "Willingly Participated" in the plot to harm me by "Intentionally Withholding my Medication, Vitamins, Food Items and Toiletries for 7 Seven days". The delay in taking my medication aggravated my pre-existing condition from a pending Medical Malpractice case in Manhattan Supreme Court and further detroriated my medical condition. When the items were returned a week later in garbage bags, all medication pills were trashed crushed and tossed with rotten stinking bad food which I was unable to take any missed dosages. The delay elevated my levels as evident in blood test results and I had to get injections to treat skin disease aggravated by dust and damage done to my wardrobe and belongings.

135. "As a general rule, a landlord may not seize, throw out, lock up, or otherwise deny a tenant access to their property." The landlord cannot just throw away or confiscate the tenant's property! Exception For Medical Equipment/Prescriptions. None of these rules apply to prescription medication and medical equipment. A landlord must *always* store these for at least 7 days, and return them promptly when the tenant asks, no matter what. *Wis. Stats. 704.05(am)"(Real Property Law§ 259-c);*

136. Landlord's "Conduct" was malicious, intolerable, negligent and reckless that caused me "Extreme Stress and Mental Anguish, Pain, Suffering" emotional breakdown, high blood pressure, pulse, chest pain, numbness, dizziness, fainting, headache, depression, anxiety, embarrassment and humiliation. I had to call an ambulance and was transported to the nearest ER. The incident made me physically in pain and trauma, failing my already delicate health condition from pending Medical Malpractice case in Manhattan Supreme Court. Landlords are prohibited from harassing or retaliating against tenants who exercise their rights. Tenants may collect damages from landlords who violate this law. (Real PropertyLaw § 223-b). violated my 14 Amendment rights by vandalizing, damaging and having my belongings stolen by her bogus moving company.

137. Luckily, I was able to pay her movers and retrieve all my belongings now stored in my storage facility in Manhattan and when I unpacked the boxes, everything I owned was vandalized, damaged and broken. My deceased mother's dresses that held sentimental value was used to pack paintings,

porcelain, kitchenware, cleaning products, shoes and accessories. My clothing and bedding linen was found inside the rugs which I am unable to use due to dust that can cause breakout and rash on my skin. The cost to dry clean my wardrobe is $12,000 which I cannot afford at this time without an income. I don't even have warm clothing due to damage done to my wardrobe by the landlord.

138. Landlord harassed, threatened, abused, defamed and ruined my reputation and called me bad names for unpaid rent. I was also humiliated, insulted and threatened by the Trump Management at the apartment building never to go into that building not even to see my friends who reside there otherwise they said they will have me arrested which is not an excusable defense days after eviction took place. This is All in Retiliation for unpaid rent by HRA.

139. After eviction, I stayed with friends for few days and in hotel lobbies and 24 hour dinners because I had no money. I also sold my deceased mother's jewlrey which was her last memory for me only to pay for a short term rental and be safe with a roof over my head. With extreme health issues and disability, I am unable to work and pay current rent. I submitted request for payment of current apartment bill and to date nothing has been paid accept $107.50 to the landlord which is not even close to the rent due monthly rent at $4,200. As a result, the current landlord threatened to change the locks and have me evicted while I have no money for rent, food and medical expenses.

140. On December 7th 2023 at the day of eviction my movers moved all my belongings into two side by side units because all my furniture couldn't fit into one unit at Manhattan Mini Storage at *420 East 62nd Street New York, New York 10065*. The units were cheapest available for rent. I submitted request for rental assistance and storage bill again as it accumulated with late unpaid fee since August of 2023 with the total amount past due including late fee for storage was $5,500. Requests was made multiple times by submitting Form I-137A but not a dime has been paid by HRA for storage and apartment rent and on February 28th 2024 all my belongings valued at $439,854,97 were auctioned at storage facility for unpaid bill.

141. The storage unit held all All Personal Property, Business Inventory, Clients Orders, Interior Design Porcelain, Vases, Urns, Lamps, Scones, Shades, Mirrors, Shelves, Candle-Stands, Tall Candles, Boxes, Venetian Trays and Masks, Framed Family Photos, Family 1920's Quran, Religious Items, My Baby's Dolls, Clothing, My Deceased Mother's Funeral Sheets, Pink 1972 Wedding Dresses, My Dresses and School Uniform, Graduation Gown, Shawls, Fur Wraps, Gold Silver Sequence Clutch Purse, LV Checkbook Cover, Ginori Pink and Red Square Tray Plates, Paintings, Business Clients Artwork, Etching, Wall Hangings and Plagues, 7 Rugs, Curtains, Pillows, Linen, Kitchenware, Bathroom Accessories, Office Supplies, Fashion Accessories Pins, Brooches, Door Knobs, Handles, Long Suede And Leather Tassels, Ribbons, Leather Fabric and Swatches, Sewing Material, Electronic Gadgets, USB's, Digital Content, Check-books, Credit Cards, Cell Phone, Ipad, MacBook Covers, Mac Software CD's and Boxes with Serial Numbers are all Intellectual Business Property, Patents, Copyright, Design Rights, Trademarks. Any Sale or use of my Business Inventory is illegal use of Infringement. Intellectual Property from unauthorized access, use, or theft is a crime. "Penalties for infringement include civil and criminal penalties. In general, anyone found liable for civil copyright infringement may be ordered to pay either actual damages or "statutory" damages affixed at not less than $750 and not more than $30,000 per work infringed. For "willful" infringement, a court may award up to $150,000 per work infringed. A court can, at its discretion, also assess costs and attorney's fees. *See details, See Title 17, United States Code, Sections 504, 505.* Willful copyright infringement can also result in criminal penalties, including imprisonment of up to

five years and fines of up to $250,000 per offense. Damages are monetary compensation awarded to a Plaintiff who has suffered a loss or injury due to the defendant's unlawful conduct."

142. My Family Aviation Military Belongings were in the storage. The Service Members Civil Relief Act (SCRA) Federal Law prohibits all storage facility operators from auctioning off a service member's possessions without a court order. I will never get a single thing from what I owned at the facility valued at $439,854,97 all gone.

143. HRA has caused me extreme emotional distress and discriminated by not following my request for payments in timely manner. This stress has put me at increased risk of high blood pressure, last test was 148/103 with extreme emotional distress and pain. I am also diagnosed with "Unspecified Depressive Disorder and Posstraumatic Stress Disorder."

144. I also requested Fair Hearing and sent numerous fax and uploaded documents on the App but it went unpaid and put me at risk of not only being homeless but also having my whole storage was auctioned on February 28th, 2024 leaving me with nothing not even wardrobe. Everything I ever worked hard for is all gone valued at $439,854,97 for $5,500 unpaid bill. Its like walking out of a house on fire with nothing. As a result, I have been uncontrollably crying and in deep trauma unable to focus on anything with extreme depression, anxiety, post-traumatic stress disorder PTSD, shame, insomnia, nightmares, flashbacks, fatigue, chronic headaches, high blood pressure and pulse.

145. As stated in "14th Amendment to the U.S. Constitution: Civil Rights (1868) All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United nStates and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

146. As a disabled person, my basic right to live and survive have been violated and I hold HRA accountable for their actions. In my current situation with no place to go and no money, it is now significantly exacerbating my ongoing health issues and causing extreme hardship.

147. HRA Customer service never calls back and hold time is very long and when I fax and send documents through the app, its never updated and HRA agents always respond by saying that they never received any documentation when I have conformation of fax sent and proof of app documents successfully uploaded.

148. HRA's job is to help people not for employees working to discriminate and treat visitors poorly who walks into their office for help as if everyone is mentally disturbed. HRA employees are not doing their jobs and intentionally causing homelessness and harm to the applicants.

149. I requested Attorney General's Office to initiate an investigation for HRA not complying with their legal obligation to meet all processing timelines, recertification, application processes, such as eligibility interviews and verification procedures and stop them from harming applicants in urgent need looking for help. I am being discriminated and unfairly treated by intentional delays and lack of help in my urgent need as I am now already evicted from my home and storage belongings all auctioned and sold to someone who now has access to my family valuables and personal documents etc.

150. HRA must comply with their legal obligation to meet all processing timelines as stated on the website and as required by law regarding SNAP and Cash assistance applications and recertifications and to maintain reliable, functional processes, such as eligibility interviews and verification procedures. I sent HRA an official Demand notice I March 2024 to be tendered in court as evidence

of HRA failed to cooperate but it was ignored and thats why I am now ready to submit this complaint in Manhattan Supreme Court to resolve this matter.

151. According to Fair Hearing # 8739247H in Case # 009039662855E Dated 02/29/2024 Decision by John Vesey, Administrative Law Judge at Office of Temporary Disability Assistance, Applicable Law; Administrative Directives 02 ADM-2 provides that "The uncontroverted evidence in this case establishes that the Appellant requested that the Agency provide a grant for the payment of storage fees. The Agency failed to present evidence at the hearing to establish that it has acted on the Appellant's request for such grant. Accordingly, the Agency's action cannot be supported. The Agency's failure to act on the Appellant's application for a grant to pay storage fees is not correct and is reversed. The Agency is directed immediately to investigate the Appellant's eligibility for a special grant for the payment of storage fees, to provide the Appellant with written notification as to the results of such investigation and to provide the Appellant with a grant for the payment of storage fees to the extent permitted by 18 NYCRR 352.6(f) if the Appellant is found eligible. Should the Agency need additional information from the Appellant in order to comply with the above directives, it is directed to notify the Appellant promptly in writing as to what documentation is needed. If such information is requested, the Appellant must provide it to the Agency promptly to facilitate such compliance."

152. According to Fair Hearing # 8717039H in Case # 00039591919E Dated 01/19/2024 Decision by Sheryl Channer, Administrative Law Judge at Office of Temporary Disability Assistance, Applicable Law; Administrative Directives 02 ADM-2 provides that "The evidence establishes that the Appellant applied for assistance to pay rent arrears. The is not  in receipt of Public Assistance or Supplemental Security Income benefits. The Appellant contended at the hearing that she submitted an application for assistance to rent arrears; however, the Agency has failed to act on her application. At the hearing, the Agency agreed to continue to process the Appellant's application for assistance to pay rent arrears including allowing Appellant a reasonable opportunity to supply any necessary information and documentation; to advise Appellant in writing of the Agency's determination; and, if Appellant is eligible for assistance to pay rent arrears, to provide such assistance in accordance with verified degree of need. At the hearing, the Appellant accepted the terms of the Agency stipulation as a complete resolution of the Appellant's request for a fair hearing. In accordance with the Agency's agreements made at the hearing, the Agency is directed, if it has not already done so, to: Continue to process the Appellant's application for assistance to pay rent arrears. Advise the Appellant as to what additional information and documentation is necessary, if any. Provide the Appellant with an opportunity to provide any required information and documentation. Advise the Appellant in writing of its determination. If the Appellant is determined to be entitled for assistance to pay rent arrears, provide such assistance in accordance with verified degree of need. Should the Agency need additional information from the Appellant in order to comply with the above directives, it is directed to notify the Appellant promptly in writing as to what documentation is needed. If such information is requested, the Appellant must provide it to the Agency promptly to facilitate such compliance. As required by *18 NYCRR 358-6.4,* the Agency must comply immediately with the ctives set forth above." See Exhibit Attached.

153. Compliance Unit Never Activated the Decision and HRA is not complying with their legal obligation to meet all processing timelines as required by law for applications and recertifications and to maintain reliable, functional application and recertification application processes, such as eligibility interviews and verification procedures. Total Unpaid: Rental Arrears = $90,000 Storage Rent = $7,000 Total Unpaid = $97,000.

154. For the foregoing reasons, I demanded HRA damages to be paid for causing me homelessness and not paying rent for $90,000 and having my whole apartment valued at $439,854,97 auctioned. I demanded damages to be paid plus intentional emotional distress and pain for harm that further jeopardized my health and safety as I continue to suffer. Unfortunately, due to my dire circumstances, I am likely to suffer more harm without financial and medical assistance. These difficulties have made it impossible for me to do anything and has put me further in anxiety, trauma and depression but no HRA never responded.

155. I contacted Legal Department at Fair Hearing to file a complaint. Letter addressed by Principal Hearing Officer, Ihenjibuchi Nwuba on March 22nd 2024 stated that "This is in response to your recent inquiry to our office wherein you requested reconsideration of the above referenced Fair Hearing Decisions #8739247H. The Decision found that the Agency had failed to act on your request for payment of storage fees and directed that the Agency immediately investigate your eligibility for a special grant for the payment of storage fees; provide you with written notification as to the results of such investigation; and, if eligible, provide a grant for the payment of storage fees to the extent permitted by 18 NYCRR 352.6(f). You indicate that the Agency has failed to timely comply with the aforementioned directives and request immediate assistance, as well as payment of monetary damages, to meet your current emergency situation. In reviewing the evidence in the record of FH#8739247H, it is clear that the Decision properly directed the Agency to immediately investigate your eligibility for storage fees. In relation to such directive, it should be noted that the Office of Administrative Hearing's Compliance Unit has an active compliance file open for FH #8739247H and is vigorously seeking a response from the local Agency regarding what actions were taken to comply with the directive. As soon as OAH receives a compliance report we will evaluate such response to determine whether the Agency effectively complied with the Decision's directive. In the meantime, if you are currently facing imminent homelessness, I urge you to contact the local Agency for assistance with temporary housing. It must also be noted, however, that the OAH Commissioner had no jurisdiction to award monetary damages stemming from any action or failure to act on the part of the local Agency. I trust that this addresses your immediate concern and provides a better understanding of the role of OAH as it relates to local Agency compliance with your Fair Hearing Decision." See Exhibit Attached.

156. On March 12th 2024, I received a letter "Notice To Report To Center" from the HRA Center at 109 East 16th Street New York, NY 10003 stating to submit Documents: "Most current monthly breakdown, rental ledger, proof of past income, proof of contributions rent/arrears, completed W146 & proof of their income, personal statement why you fell behind in past due rent." I Submitted the required documents and faxed but there was no response. I re-submitted the documents.

157. On March 3rd 2024, I received a Fair Hearing Compliance Statement stating that, "Because you have failed to respond to our letter, we cannot complete any compliance action until you come in and/ or supply the requested information. If you come in and/or bring the information to your Center within ten (10) days from the date of this notice, we will consider the information in accordance with the Fair Hearing decision. Documentation/information returned after ten (10) days will be used to determine your eligibility for the benefits at issue from the date of receipt. Review completed. Client is not eligible for storage payments. Client provided documentation she's living in permanent housing since November 2023 as per policy, client not eligible for storage due to living in permanent housing. In December 2023, two other storage units increased her bill from $161.99 to $1677.97/mth. These extra storage amount does not comply with agency policy regarding size & amount. Therefore Appellant was denied storage payment."

158. First, I never received a letter so how can I fail to respond to HRA letter if it never arrived in mail. They quickly jumped to assumptions and failed to verify accurate information with me and jumped to completion of the review without verifying with me first.

159. Second, I was NOT living in permanent housing since November 2023. I was in EVICTION with Marshall's warrant. See Exhibit Attached so as per policy, how am I not eligible for storage due while I am in eviction?

160. I have been renting storage since 2012 until 2020 and then again from 2021 to 2022 and HRA paid the monthly storage fee directly to the storage between $565 to $850 with tax included.

161. When I was served with eviction by the Landlord at 845 United Nations Plaza Apt 18G New York, NY 10017 in January 2023, I rented storage unit to place my suitcases and HRA paid $161.99 a month until August 2023 and after August 2023 it went unpaid accumulated with late fee on past due amount. When I inquired, I was not given accurate information on the application and status of payments and never received any notices by mail.

162. I submitted request for rental assistance for back rent and new apartment advance rent plus storage bill again as it was accumulated with late fee since August of 2023 in the total amount past due for $5,500. Requests was made multiple times by submitting Form I-137A but only $597.01 was paid on December 8th 2023 for storage and balance accumulated to $5,500 with late fee on February 28th 2024. Not a dime was paid for back rent on previous apartment and advance rent on new apartment or storage and as a result all my belongings valued at $439,854,97 were auctioned at storage.

163. The storage unit held all All Personal Property, Business Inventory, Clients Orders, Interior Design Porcelain, Vases, Urns, Lamps, Scones, Shades, Mirrors, Shelves, Candle-Stands, Tall Candles, Boxes, Venetian Trays and Masks, Framed Family Photos, Family 1920's Quran, Religious Items, My Baby's Dolls, Clothing, My Deceased Mother's Funeral Sheets, Pink 1972 Wedding Dresses, My Dresses and School Uniform, Graduation Gown, Shawls, Fur Wraps, Gold Silver Sequence Clutch Purse, LV Checkbook Cover, Ginori Pink and Red Square Tray Plates, Paintings, Business Clients Artwork, Etching, Wall Hangings and Plagues, 7 Rugs, Curtains, Pillows, Linen, Kitchenware, Bathroom Accessories, Office Supplies, Fashion Accessories Pins, Brooches, Door Knobs, Handles, Long Suede And Leather Tassels, Ribbons, Leather Fabric and Swatches, Sewing Material, Electronic Gadgets, USB's, Digital Content, Check-books, Credit Cards, Cell Phone, Ipad, MacBook Covers, Mac Software CD's and Boxes with Serial Numbers are all Intellectual Business Property, Patents, Copyright, Design Rights, Trademarks. Any Sale or use of my Business Inventory is illegal use of Infringement. Intellectual Property from unauthorized access, use, or theft is a crime. "Penalties for infringement include civil and criminal penalties.

164. In general, anyone found liable for civil copyright infringement may be ordered to pay either actual damages or "statutory" damages affixed at not less than $750 and not more than $30,000 per work infringed. For "willful" infringement, a court may award up to $150,000 per work infringed. A court can, at its discretion, also assess costs and attorney's fees. See details, See Title 17, United States Code, Sections 504, 505. Willful copyright infringement can also result in criminal penalties, including imprisonment of up to five years and fines of up to $250,000 per offense. Damages are monetary compensation awarded to a Plaintiff who has suffered a loss or injury due to the defendant's unlawful conduct."

165. My Family Aviation Military Belongings were in the storage. The Service Members Civil Relief Act (SCRA) Federal Law prohibits all storage facility operators from auctioning off a service member's possessions without a court order. I will never get a single thing from what I owned at the facility

valued at $439,854,97 all gone. HRA has caused me extreme emotional distress and discriminated by not following my request for payments in timely manner. This stress has put me at increased risk of high blood pressure, last test was 148/103 with extreme emotional distress and pain. I am also diagnosed with "Unspecified Depressive Disorder and Posstraumatic Stress Disorder."

166. I requested HRA for One Deal Shot Grant for Rental Arrears to stop eviction and pay back rent or even advanced rent and storage bill but my request was completely ignored. As a result eviction was ordered by Honorable Judge Vanessa Fang in Manhattan Housing Court for non payment of rent, Marshall's warrant was issued on November 14th 2023 and I was evicted on December 7th, 2023.

167. First application for Emergency Safety Net Assistance (ESNA) Form 147-H, Case # 00038192917D For $90,000 year's up rent at $7,500 a month x 12 months = $90,000 was submitted on 11/6/2023.

168. Second application for Emergency Safety Net Assistance (ESNA) Form 147-H, Case # 00039574091D For $67,500 year's up front rent was submitted on 10/26/2023. The was a wrong amount because correct amount was $90,000 but would have helped with the rental payments.

169. Both Shelter Arrears Repayment Agreements were authorized and signed by M. Santana and M. Almonte and stated that "Note: This form is not valid unless the Applicant's signature is present." HRA representative confirmed that the application is deemed completed after applicant signs since it has already been approved by supervisor and why it was sent for applicants signature. I never received any payments on either of the applications after I signed and sent it back.

170. As a result I was evicted and I had no choice but to place my whole apartment in storage which movers couldn't fit into one unit and thats why I had to rent two side by side units to store everything safely. I didn't wanted to have my expensive $439,854,97 furniture and belongings garbaged to meet HRA's agency policy regarding size and amount when it was due to HRA's neglience for not paying grant, I was evicted from my home for nonpayment and became homeless.

171. On March 25th 2024, I received a Notice of Decision stating that "This seems to be a business enterprise and not a residence. The client receives cash assistance and there is no proof of any other income in the household. The clients arrears total of $75,000 owed through October/2023. The monthly rent is $7,500.00. The client claims to be residing at this address but yet has her property store at a storage facility which signifies that the current address is purely for business not residential purposes. RAU does not accommodate requests for arrears accumulated by a business. She needs to contact a bank for such loans. The case should be denied for the above, in addition to the fact that the monthly rent is excessive, and the arrears are excessive. We will recommend that the client secure the services of an attorney for assistance in such a case if she does not already have one."

172. I Submitted the required documents and faxed my response again to clarify that "First, Trump Tower rental arrears was in the year Nov 2022 to 11/10/2023. It was $7,500 a month for rent. Half of it was declared in taxes that means after taxes I would be paying $3,250 half of $7,500 but initially before taxes I have to pay $7,500 x 12 months = $90,000 1 year rent thats why it was excessive initially and was approve and I got Emergency Safety Net Assistance (ESNA) Shelter Arrears Repayment Agreement W-147-H Form on 11/6/2023 and 10/26/2023 which was never completed by your office after it was signed by myself and the supervisor. Your office failed to honor the rent.

173. Second, I worked from home like everyone does so that doesnt mean that the apartment is a commercial lease home office. Lease is under my name. Trump tower does NOT allow offices in the building so you need to read the lease and look at documentation I sent before wrongfully denying and depriving me of rent arrears.

174. Third, Sereen is third party to cover rent arrears as signed on the form so why is it an issue to accept that as third party payment is what I don't understand. Last, rent for new apartment at Furnished Quarters (Already submitted bill) is now four months behind is at $4,200 a month x 4 months (Dec, Jan, Feb and March) is $16,800 going on 5th month for April due so total due is $20,000 rental arrears and thats what I am asking to pay ASAP But NOTHING has been paid not even restaurant allowance $126 plus funds to buy clothing and basic necessity. Nothing has been done after Fair Hearing Judge's directive orders. I have sent this complaint to Letitia James at Attorney General's office and prepared a Summons and Complaint to submit in Manhattan Supreme Court against HRA workers who have caused me homelessness and put me on streets. I have LOST EVERYTHING my home, business, storage valued at $439,854,97 with personal belongings including my dead mother and baby's things which can never be replaced. Supervisors at HRA who don't do their jobs must be held accountable for their actions to cause people in need like myself more pain suffering and intentional emotional distress at a challenging time already. I don't need to suffer while I am going through disability because of HRA's neglience and damages to have me evicted from my home and storage valued at $439,854,97 auctioned. HRA is wrongfully failing to meet its obligation to process SNAP and Cash Assistance applications and recertifications. The City's pattern of noncompliance is systemic neglect and severe. HRA's broken processing systems. Documents are either lost or ignored, and SNAP and cash assistance recipients cannot reach the agency via its outdated, overwhelmed, central phone line. I will address these class action allegations in a formal lawsuit since nothing is been paid and more pain and harm is subjected to me by HRA workers who lack humanity, respect and regard for life!  If I don't get a check for new apartment rental arrears of $20,000 and at least $15,000 special grant to buy new belongings and furniture auctioned in storage than I will start a case in Manhattan Supreme Court on 4/2/2024."  HRA never responded.

175. If I could get a bank loan than I wouldn't be contacting HRA. No bank will offer loan with 400 credit score that was effected by my business lender who did not pay landlord advance one year rent and breached the contract and why I was evicted for non payment of rent.

176. As a result, I owe back rent since November 2022 and has utility arrears because I had to redistribute my savings and cash on hand by selling my expensive belongings to pay for transportation, out of pocket medical bills and other personal expenses to survive.

177. HRA has also failed to comply with the Fair Hearing Judge's orders from Jan and Feb 2024 to issue back rent, special grant and assist in storage payments.

178. I received SNAP benefits in the amount of $281. I also received a $95 SNAP Emergency Allotment but never received any restaurant allowance and cash to purchase clothing, shoes, bags and personal items auctioned in storage. I don't even have proper clothing and money for out of pocket medication, expenses and transportation to the center or court. I had to walk 40 blocks with injuries aggravated from pending medical malpractice in Manhattan Supreme Court. And as of today to date of this complaint, no rent grant has been issued to cover my   current apartment back rent to the landlord since December 2023 move in for $4,200 a month. As a result, the landlord is now threatening eviction yet again putting me at risk of homelessness and intentional emotional distress pain and suffering.

179. The lack of Cash Assistance has had a dramatic impact on me. I depleted my savings and have no money in my bank account and no way to meet my basic needs. I have not received any Grant or Rental Arrears and Storage Payments neither did I ever receive any other notices about my benefits. I called the numbers listed on the notice as well many times but either was unable to get through, was

cut off after being transferred, or, if I reached a human, was simply not helped. On many occasions, I called up to several times a day, hoping for help. One of the telephone numbers on the notice would just cut off. I reached a representative before I got cut off, the representative would transfer me, and then I would be cut off. At no time did any HRA representative resolve the issue. Eventually, I could not get through on any of the numbers I tried. Despite calling every number I could find, I did not have any success reaching anyone associated with the center and at the program who would help me.

180. Due to my medical condition and disablty that impairs my ability to travel and interact in crowded places, I am unable to go to center every week for the same issue. I applied for Cash Assistance using ACCESS HRA a program that allows users to apply and recertify for HRA-administered benefits and submitted all supporting documents using the ACCESS HRA mobile app. I received confirmations that my applications had been successfully submitted But never received a phone call from HRA to complete my phone interview. I also did not receive any sort of notice from HRA informing me that I needed to submit any additional documents. I had no information about the status of my application, and never received a determination from HRA. I checked the status of my application however, my application was pending than denied than pending again and denied while I was still without Cash Assistance benefits other times. Despite completing everything required for my application, I have been deprived of benefits to which I am entitled. HRA has not complied with the fair hearing decision.

## STATEMENT OF CLAIMS

181. Paragraphs 1 through 180 are incorporated by reference as if fully stated in the claims for relief set forth below. Because I am a plaintiff in this proceeding pro se, the Court must construe my complaint liberally and evaluates it by "less stringent standards than formal pleadings drafted by lawyers." *See; Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)); See also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009)*. All proceeding for the recovery of penalties for the violation of any law must be "read to raise the strongest arguments that they suggest." *See; Fowlkes v. Ironworkers Local 40, 790 F.3d 378, 387 (2d Cir. 2015)*

## FIRST CLAIM FOR RELIEF

### SNAP ACT AND IMPLEMENTING REGULATIONS

### FAILURE TO TIMELY PROCESS COMPLETED SNAP

### APPLICATIONS AND RECERTIFICATIONS

182. Defendants, as a matter of policy, practice, and procedure, fail to timely process SNAP applications and applications for recertification and to provide benefits to all eligible households within the time frames specified, in violation of their obligations pursuant to *7 U.S.C. §§ 2020(e)(3), (4), (9); 7 U.S.C. § 2014(a),* and its implementing regulations, *7 C.F.R. §§ 273.2(a)(2), (g)(1), (i)(2), (i)(3)(i), 7 C.F.R. § 273.14.* Defendants are and have been on notice of these ongoing violations. As a result of

Defendant's policies, practices, and procedures, I am deprived of my right to apply for, recertify for, and receive SNAP benefits to which I am entitled to. Defendant's policies, practices, and procedures of failing to process SNAP applications and applications for recertification and to provide benefits were conducted under color of law. This violation of law is actionable under *42 U.S.C. § 1983.*

## SECOND CLAIM FOR RELIEF

## SNAP ACT AND IMPLEMENTING REGULATIONS

## FAILURE TO MAINTAIN SYSTEM THAT PROVIDE ACCESS FOR

## INITIAL SNAP APPLICATIONS AND RECERTIFICATIONS

183. Defendants, as a matter of policy, practice, and procedure, fail to provide reliable and accessible access to SNAP application and recertification processes, in violation of their obligations pursuant to *7 U.S.C. § 2020(e)(3)-(4), (9); 7 U.S.C. § 2014(a),* and implementing regulations*, 7 C.F.R. §§ 273.14, 273.2,* including by:

184.a) failing to provide reliable and accessible methods for filing initial applications and recertifications;

185.b) failing to schedule required eligibility interviews and to provide reliable and accessible processes through which households may timely complete these required eligibility interviews; and

186.c) failing to provide a reliable, accessible process for the submission of required documents, including by failing to provide accessible methods for me to submit documents required in initial applications and recertifications for SNAP benefits so that they will be reliably reviewed and timely acted upon by Defendants, failing to provide assistance in securing required documentation, and failing to review documents in the agency's possession, resulting in erroneous deprivation of SNAP benefits.

187. Defendants are and have been on notice of these ongoing violations. As a result of Defendant's policies, practices, and procedures, I am deprived of my right to apply for, recertify for, and receive SNAP benefits to which I am entitled to. Defendant's policies, practices, procedures of failing to provide reliable and accessible alternative methods for filing initial applications and recertifications using the online system for SNAP were conducted under color of law. This violation of law is actionable under *42 U.S.C. § 1983.*

## THIRD CLAIM FOR RELIEF

## DUE PROCESS CALUSE OF THE UNITED STATES CONSTITUTION

## FAILURE TO PROVIDE ADEQUATE DUE PROCESS IN THE ADMINISTRATION OF

## SNAP AND CASH  PROCESS IN THE ADMINISTRATION OF SNAP AND CASH

## APPLICATIONS AND RECERTIFICATIONS

188. I have a property interest in applying and recertifying for SNAP and Cash Assistance benefits for which I am eligible for. Defendant's failure to timely process my SNAP and Cash Assistance applications and recertifications results in *de facto* denials of benefits without notice or the opportunity for a hearing in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Defendant's dysfunctional policies, practices, procedures, and systems deprive me of access to SNAP and Cash Assistance benefits, fail to provide required notices, and subject otherwise eligible individuals to arbitrary and/or erroneous denials of benefits in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Defendants are and have been on notice of these ongoing violations. Defendant's policies, practices, and procedures of *de facto* denying me access to SNAP and Cash Assistance were conducted under color of law.

## FOURTH CLAIM FOR RELIEF

### NEW YORK SOCIAL SERVICES LAW AND IMPLEMENTING  REGULATIONS FAILURE TO TIMELY PROCESS COMPLETED APPLICATIONS AND RECERTIFICATIONS

189. Defendants, as a matter of policy, practice, and procedure, fail to timely process Cash Assistance applications and recertifications and to provide benefits to all eligible households within the timeframes specified in the law and regulations, in violation of *New York Social Services Law § 131; 18 N.Y.C.R.R. §§ 350.3(b), 351.1(c)(1), 351.8, 351.20, 351.22, 351.26, 369.6(a).* Defendants are and have been on notice of these ongoing violations. As a result of Defendant's policies, practices, and procedures, I am deprived of my right to apply for, recertify for, and receive Cash Assistance benefits to which they are entitled.

## FIFTH CLAIM FOR RELIEF

### NEW YORK SOCIAL SERVICES LAW AND IMPLEMENTING REGULATIONS FAILURE TO PROVIDE SYSTEM THAT  PROVES ACCESS FOR INITIAL ACCESS FOR INITIAL CASH  ASSISTANCE APPLICATIONS AND RECERTIFICATIONS

190. Defendants maintain policies, practices, and procedures of failing to provide reliable and accessible access to Cash Assistance application and recertification processes, in violation of their obligations pursuant to *New York Social Services Law §§ 131, 134-(a), 158(4), 349,* and implementing regulations, *18 N.Y.C.R.R. §§ 350.3, 351.1(a), 351.1(c)(1), 351.1(b)(1)(i), 351.1(c)(1), 351.20, 351.22, 351.5(a), 351.8, 351.26, 369.6(a), 387.7(a),* including by:

191.a) failing to provide reliable and accessible methods for filing initial applications and recertifications;

192. b) failing to schedule required eligibility interviews and to provide reliable and accessible processes through which households may timely complete these required eligibility interviews; and

193. c) failing to provide a reliable, accessible process for the submission of required documents, including by failing to provide accessible methods for Plaintiffs to submit documents required in initial applications and recertifications for Cash Assistance benefits so that they will be reliably reviewed and timely acted upon by Defendants, failing to provide assistance in securing required documentation, and failing to review documents in the agency's possession, resulting in erroneous deprivation of Cash Assistance benefits.

194. Defendants are and have been on notice of these ongoing violations. As a result of Defendant's policies, practices, and procedures, I am deprived of my right to apply for, recertify for, and receive Cash Assistance benefits to which they are entitled.

195. I have been waiting for months to get assistance since HRA Human Resources of Administration Department of Social Services fail to help me with my request for rent, restaurant allowance, storage and personal needs for clothing etc. Due to their negligence of not paying my rent and storage, I was evicted on 12/7/23 and my belongings valued in storage for $439,854,97 were auctioned on 2/28/24.

196. The current apartment rent is also due with no help from HRA. I have stopped working and have zero income. I have no money for rent, transportation, food and medication. I am diagnosed with Unspecified Depressive Disorder and Post traumatic Stress Disorder due to all the trauma caused by the lack of help from HRA and no financial means to survive after losing my belongings that was all I ever had and worked to buy. I have nothing left and I am now very suicidal. I have been taking counseling but it doesnt help resolve the issue of my living arrangement, financial situation and medical needs. It is my urgent request to expedite my request for disability benefits so I can at least have some funds to survive. At the moment I don't even have $1 and there is no help.

197. Notice Received On 4/10/2024 For Storage of Furniture and Personal Belongings Stated: "As per Agency's storage policy you are not eligible because you are residing in an apartment. The three Storage units exceeds the allowable amount for your household size. Review completed. Client is not eligible for storage payments. Client provided documentation she's living in permanent housing since November 2023; as per policy, client not eligible for storage due to living in permanent housing. In December 2023, two other storage units increased her bill from $161.99 to $1,677.97 mth. These extra storage amount does not comply with agency policy regarding size & amount. Therefore Appellant was denied storage payment. Fair Hearing review complete. Agency has addressed Appellant's storage statement in the past and has informed Appellant to reduce the size of her storage. Appellant states she was previously evicted and lost all her belongings and appears to have two storage units. After review, Agency made a one time storage payment previously, Appellant failed to reduce unit/size as well as residing in an apartment where Agency is paying a portion of Appellant's rent and therefore no storage grant shall be issued at this time. Fair Hearing review complete. Agency has addressed Appellant's storage statement in the past and has informed Appellant to reduce the size of storage. Appellant states she was previously evicted and lost all her belongings and appears to have two storage units. After review, Agency made a one time storage payment previously, Appellant failed to reduce unit/size as well as residing in an apartment where Agency is paying a portion of Appellant's rent and therefore no storage grant shall be issued at this time." Supervisor A. Jaurey, A.Tam, E. Kvashka Collins & N. Collins

198. This is a false claim because I never had three storage units and no apartment due to eviction.

199. Notice Received On 4/10/2024 For Back Rent or Carrying Charges "Other, This seems to be a business enterprise and not a residence. The client receives cash assistance and there is no proof of any other income in the household. The clients arrears total of $75,000. Fair Hearing review completed. Appellant failed to submit all requested documentation to address Rent Arrears. Appellant also has an Active case# 36298838i receiving ongoing CASH and SNAP benefits."  Supervisor A. Jaurey & A.Tam

200. This is a false claim because I do not have a business address.

201. Notice Received On 4/18/2024 For Back Rent or Carrying Charges "We mailed you a letter on 03/10/2024 asking you to come in for an interview and/or submit the following: Rent ledger, 146E completed. c. by 03/26/2024. Because you have failed to respond to our letter, we cannot complete any compliance action until you come in and/or supply the requested information. If you come in and/or bring the information to your Center within ten (10) days from the date of this notice, we will consider the information in accordance with the Fair Hearing decision. Documentation/information returned after ten (10) days will be used to determine your eligibility for the benefits at issue from the date of receipt. Appellant failed to submit requested documentation. Appellant must provide current month to month landlord's breakdown through 04/24 with the beginning of zero balance. Insufficient month income from Cash W-145hh completed. Assistance to pay monthly rent of $3,250.00. Must provide viable 3rd party/roommate with current proof of income. No threat of eviction. Re-submit for reconsideration. Appellant failed to submit requested documentation."  Supervisor Martin Mason and Z. Ahmed.

202. This is a false claim because I have proof of every notice response and fax I sent.

203. Notice Received On 4/10/2024 For Replacement of Clothing lost as a result of a disaster Client does not meet the criteria for clothing allowance. Supervisor No Name Blank.

204. This is a false claim because I am in a dangerous situation due to disaster and loss and they refuse to even offer funds for clothing.

205. Notice Received On 4/03/2024 For Back Rent or Carrying Charges "We have been unable to determine if you are eligible for the benefits that were the subject of your Fair Hearing. Review completed. Client is not eligible for storage payments. Client provided documentation she's living in permanent housing since November 2023 as per policy, client not eligible for storage due to living in permanent housing. In December 2023, two other storage units increased her bill from $161.99 to $1677.97/mth. These extra storage amount does not comply with agency policy regarding size &amount. Therefore Appellant was denied storage payment. Other, This seems to be a business enterprise and not a residence. The client receives cash assistance and there is no proof of any other income in the household. The clients arrears total of $75, 000 owed through October/2023. The monthly rent is $7, 500.00. The client claims to be residing at this address but yet has her property store at a storage facility which signifies that the current address is purely for business not residential purposes. RAU does not accommodate requests for arrears accumulated by a business. She needs to contact a bank for such loans. The case should be denied for the above, in addition to the fact that the monthly rent is excessive, and the arrears are excessive. We will recommend that the client secure the services of an attorney for assistance in such a case if she does not already have one." Supervisor L. Badine and A. Tam.

206. This is a false claim because of eviction I do not have a permanent housing, no increase in storage units, not a home business address and my storage was auctioned on 2/28. If I had 800 credit score to be qualified for a bank loan than I wouldnt be applying for help at HRA.

207. Cash Assistance "This notice is to inform you that we intend to restrict your shelter allowance effective 03/13/2024. Date Your shelter allowance will be paid directly to your landlord or primary tenant. This action is taken because of administrative ease. When we restrict your shelter allowance, we will issue a vendor check for $107.50, representing part or all of your semimonthly grant of $ 199.00 .We will send the vendor check directly to your landlord or primary tenant. Only your landlord or primary tenant can cash the vendor check. If your rent is more than the amount of your shelter allowance, indicated above, you must pay the rest of your rent to your landlord or primary tenant. *The law(s) and/or regulation(s) which allow(s) us to do this is/are 18 NYCRR § 381.3 (c)(2)."* Supervisor A. Tam.

208. This is a false claim because I was granted a special grant by fair housing Judges and HRA failed to comply with the orders to get me the urgent help that I need. They discriminated baed on my previous address at Trump Tower and my business that is not in operation at the moment due to lender liability claim and no income so HRA thinks that I am a wealthy and cannot be homeless therefore they don't owe me any help like other citizens. They intentionally caused me harm and pain.

209. HRA's Review and Assumptions are all wrong about "Third Party to Pay Excess Rent" form.

210. First, Trump Tower rental arrears was in the year November 2022 to Nov 2023. It was $7,500 a month for rent. Half of it was declared in taxes that means after taxes I would be paying $3,250 half of $7,500 but initially before taxes I have to pay $7,500 x 12 months = $90,000 1 year rent thats why it was excessive initially and was approved and I got Emergency Safety Net Assistance (ESNA) Shelter Arrears Repayment Agreement W-147-H Form on 11/6 and 10/26 which was never completed by your office after it was signed by myself and the supervisor. HRA's office failed to honor the rent.

211. Second, I worked from home like everyone does so that doesnt mean that the apartment is a commercial lease home office. Lease is under my name not on my company name which is not even active now due to eviction and loss of income. Trump tower doesnt allow offices in the building so you need to read the lease and look at documentation I sent before wrongfully denying and depriving me of rent arrears.

212. Third, Sereen is third party to cover rent arrears as signed on the form, it shouldn't be  an issue to accept that as third party payment.

213. Last, rent for new apartment at Furnished Quarters (Already submitted bill) is due for four months at $4,000 a month x 4 months (Dec, Jan, Feb, March April) is $20,000 going on 1st month for May total due is $24,000 rental arrears and thats what I am asking to pay ASAP But NOTHING has been paid by HRA not even restaurant allowance $126 plus funds to buy clothing and basic necessity. Nothing has been done after Fair Hearing Judge's directive orders. HRA workers have caused me homelessness and put me on streets. I have LOST EVERYTHING my home, business, storage valued at $439,854,97 with personal belongings including my dead mother and baby's things which can never be replaced. Supervisors at HRA who don't do their jobs must be held accountable for their actions to cause people in need like myself more pain suffering and intentional emotional distress at a challenging time already. I don't need to suffer while I am going through disability because of HRA's neglience and damages to have me evicted from my home and storage valued at $439,854,97 auctioned.

214. HRA is wrongfully failing to meet its obligation to process SNAP and Cash Assistance applications and recertifications. The City's pattern of noncompliance is systemic neglect and severe. HRA's broken processing systems. Documents are either lost or ignored, and SNAP and cash assistance recipients cannot reach the agency via its outdated, overwhelmed, central phone line. HRA has

caused more pain and harm by workers who lack humanity, respect and regard for human life and must be fired and held accountable for their actions.

## SIXTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (NEID) & GROSS NEGEGLIENCE

---

**215.** Defendants,"Willfully Aided & Abetted & Violated Multiple Federal & State Laws" Defendants had a duty of care and to act in a reasonable and careful manner with me in the performance of their obligations in connection with my Application. Defendants breached their duty towards the me by negligently and as a result of the aforesaid, defendants deprived me of my rights. By reason of the aforesaid, I have suffered and continue to suffer as I am unable to pay rent and other damages, including, but not limited to, fees and expenses.

**216.** As a direct and proximate result of willful conduct, I have suffered and continue to suffer severe mental anguish and emotional distress, depression, anxiety, embarrassment, humiliation, degradation, and loss interest, enjoyment, self-confidence and self-esteem. Extreme Intentional Infliction of Emotional Distress aggravating existing painful medical malpractice injuries. Physical pain with high blood pressure, pulse, headaches, stress, weakness, fainting, uncontrollable crying, shock, emptiness, confusion, anxiety, depression, loss of interest in daily activities, loss of work, unsafe, suicidal, motivation, emotionally, physically and mental exhaustion and fear. I have also been diagnosed "Unspecified Depressive Disorder and Post Traumatic Stress Disorder". Defendants have caused me so much stress of losing my deceased mother and infant's belongings which was all what I had of them.

217.As a result of Defendants unlawful conduct, I also aggravated and now facing significantly exacerbating ongoing serious health issues due to a pending Medical Malpractice in Manhattan Supreme Court leading to more extreme hardship. I am in failing health amid the stresses of eviction, disability, financial distress, unemployment and bankruptcy. I continue to suffer and now being deprived of my basic inherent right to live in peace by Defendant's wrongful act for not helping me and complying with Fair Hearing Judge's orders. It is now certain that with the calamitous spiral of events and loss of everything at Defendant's negligence in this matter that has now landed me helpless and in the most frightening, vulnerable and weak state of mind and extreme emotional distress and pain. I suffered an injury as a result of the allegedly deceptive practice with substantial loss valued at $439,854.97 and deserve to be compensated for my loss.

218.I have demonstrated a likelihood of succeeding on the Merits of this claim that Defendants engaged in multiple Civil and Federal violations and unlawful conduct. I have sufficiently pleaded that all named defendants in this action engaged in intentional illegal malicious act. This breach is now causing me delays and substantial financial loss to me now with loss of my home in eviction for non payment of rent and auction of my personal belongings in storage, unpaid medical bills and expenses. For the Foregoing reasons I am entitled to a deserving award for everything I have been through in chain of events of extensive damages to me by an act of complete disrecard for humanity and deprivation of my legal rights.

## REQUEST FOR RELIEF

**WHEREFORE**, I respectfully request that this Court enter a judgment in my favor as follows:

A.  Certify that this action is a class action pursuant to *Fed. R. Civ. P. 23(a) and 23(b)(2)* as a resident of New York City who, since January 2023, applied or recertified, attempted to apply or recertify, are applying or recertifying, or will apply or recertify for SNAP and/or Cash Assistance benefits; and for whom HRA has not or will not timely process such applications or recertifications, or who have been or will be unable to complete their applications or recertifications due to HRA's systems, policies, practices, and procedures.

B.  Declare that: Defendant's failure to process SNAP and Cash Assistance applications and recertifications, including applications entitled to expedited processing, and provide benefits to those eligible within the timeframes required by law violate my rights as a Class member's rights under the SNAP Act and implementing regulations *(7 U.S.C. §§ 2020(e)(3),(4),(9), 2014(a); 7 C.F.R. §§ 273.2(a)(2), (g)(1), (i)(2), (i)(3)(i), and 273.14),* and the New York State Social Services Law and implementing regulations *(N.Y. Soc. Serv. Law §§ 131; 18 N.Y.C.R.R. §§ 350.3(b), 351.1(c)(1), 351.8, 351.20, 351.22, 351.26);* and

C.  Defendant's failure to provide and maintain reliable, accessible processes by which New York City households can apply and recertify for SNAP and Cash Assistance benefits by submitting applications and recertification, completing mandatory interviews, and complying with verification requirements violates my rights and Class members rights under the SNAP Act and implementing regulations, and *New York Social Services Law §§ 131, 134-(a), 158(4), and 349* and implementing regulations the SNAP Act and New York Social Services Law, and implementing regulations, as well as the United States Constitution including without limitation by ordering Defendants:

D.  To meet all timelines required by law regarding processing applications and recertifications for SNAP and Cash Assistance benefits, and to provide benefits to those eligible within the timeframes required by law;

E.  To establish and maintain reliable and functional application and recertification application processes for SNAP and Cash Assistance benefits;

F.  To establish and maintain reliable and accessible processes through which households may timely complete their required eligibility; Permanently enjoin and direct Defendants to comply with their obligations,

G.  To establish and maintain functional SNAP and Cash Assistance verification procedures and processes and assist households in securing required verification;

H.  To immediately process applications and/or recertifications for, and provide all benefits to  me and

I.  To identify, process applications and recertifications for, and provide retroactive benefits to all other SNAP and Cash Assistance recipients who failed to receive benefits as a result of Defendant's failures to comply with their legal obligations; and

J.  To provide all notices to households as required by law and reasonable legal fees, as provided by 42 U.S.C. § 1988; costs and disbursements; and Award costs and disbursements;

K.  To pay for current short term furnished temporary rental apartment at 1*8 West 48th Street Apt 3A New York, NY 10036* back rent due since December 2023 to now at $7,500 a month furnished (since I lost my $439,854.97 furniture and household items) Now Due unpaid rent of short term rental total $75,000.

L.  To pay for advance rent for the whole year to move to a year lease in a permanent apartment at a $6,500 a month including broker's fee, security deposit and mover's past service for move.

M.  To pay compensation for loss of my storage belongings valued $439,854,97 for every single thing I worked all my life to earn and purchase that has been wrongfully taken from me in illegal auction.

N.  To purchase everything all over again from household antique furniture for the true value of what I bought it for and lost to all my personal belongings, wardrobe, shoes, bags etc in the total amount of $439,854,97.

O.  To pay $250,000 for causing extreme intentional infliction of emotional distress, pain and suffering to me that further aggravated my pre existing medical malpractice injuries and for violating and not complying with fair hearing Judge's Orders to grant special grants to me and full-fill their obligations and duties owed to me.

P.  To cover out of pocket medical expenses needed for surgery and medication ASAP.

Q.  To pay total $1,000,000 for all damages including legal cost and expenses in filing of this lawsuit.

R.  And Order such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

Dated: New York, New York
        December 8th, 2024

*Sehra Waheed*
*Plaintiff / Pro-Sey*

18 West 48th Street, Apt 3A
New York, NY 10036
Cell: 917 244 4416
Email: sehrany@aol.com

## VERIFICATION

I, **Sehra Waheed, appearing** as **Pro-Se Plaintiff** in this matter**,** being duly sworn, deposes and says that I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Respectfully Submitted,

Dated: New York, New York
       December 16th, 2024

**Sehra Waheed**
**Plaintiff / Pro-Sey**

18 West 48th Street, Apt 3A
New York, NY 10036
Cell: 917 244 4416
Email: sehrany@aol.com

## SERVICE OF LEGAL DOCUMENTS

In Accordance with NY CPLR section 308(2), subpoenas and legal process must be served via the DSS* Office of Legal Affairs subpoena window located at 150 Greenwich Street, New York, NY 10007, 38th Floor. Service must be completed at this location in person or in the manner required by applicable law or order of the court. The subpoena window is open Monday-Friday from 9:00am to 5:00pm, excluding holidays.  *DSS is comprised of the NYC Human Resources Administration and the NYC Department of Homeless Services.

**DSS Office of Legal Affairs Subpoena Window**
**150 Greenwich Street, 38th Floor**
**New York, New York 10007**



Sehra Waheed
Founder at The Sereen
Artist & Interior Designer
Creative Stylist In Fashion Accessories

The Centria
18 West 48th Street, Apt 3A
New York, NY 10036
Cell: 917 244 4416
Email: Sehrany@aol.com
Email: Info@thesereen.com
Web: www.thesereen.com